2006 OK CR 20

**Alfred Brian MITCHELL, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2002–1427.**

Court of Criminal Appeals of Oklahoma.

May 30, 2006.

Gina Walker, Eugenia Bauman, Anythony Sykes, Assistant Public Defenders, Oklahoma County P.D.'s Office, Oklahoma City, OK, attorneys for defendant at trial.

Richard Wintory, Joellyn McCormick, Assistant District Attorneys, Oklahoma County District Attorneys Office, Oklahoma City, OK, attorneys for the State at trial.

Andrea Diglio Miller, Assistant Public Defender, Oklahoma County Public Defenders Office, Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

*OPINION*

CHAPEL, Presiding Judge.

¶ 1 In 1992, Alfred Brian Mitchell, Appellant, was tried by a jury and convicted of First–Degree Malice Aforethought Murder, in violation of 21 O.S.1991, § 701.7, Robbery with a Dangerous Weapon, in violation of 21 O.S.1991, § 801, Larceny of an Automobile, in violation of 21 O.S.1991, § 1720, First–Degree Rape, in violation of 21 O.S.1991, §§ 1111, 1114, and Forcible Anal Sodomy, in violation of 21 O.S.1991, § 888, in the District Court of Oklahoma County, Case No. CF–91–206. In the sentencing phase, the jury recommended a death sentence for the murder after finding: 1) the murder was "especially heinous, atrocious, or cruel"; 2) the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and 3) there was a "probability that [Mitchell] would commit criminal acts of violence that would constitute a continuing threat to society." [1] In accordance with the recommendations of the jury, the trial court sentenced Mitchell to death for the murder and to imprisonment for a total of 170 years for the other felonies. [2]

¶ 2 Mitchell appealed to this Court, and we affirmed his convictions and his sentences. [3] This Court denied Mitchell's petition for rehearing, and the United States Supreme Court denied his petition for certiorari. [4] Mitchell then sought post-conviction relief in this Court, which was denied. [5] And the Supreme Court again denied Mitchell's petition for certiorari. [6]

¶ 3 Mitchell then pursued federal habeas corpus relief in the United States District Court for the Western District of Oklahoma. [7] The federal district court, the Honorable Ralph G. Thompson, found that the State

1. *See* 21 O.S.1991, § 701.12(4), (5) and (7), respectively.

2. Mitchell was sentenced to imprisonment for 30 years for the robbery count, 20 years for the larceny count, 100 years for the rape count, and 20 years for the sodomy count, with the sentences to be served consecutively.

3. *See Mitchell v. State,* 1994 OK CR 70, 884 P.2d 1186.

4. *See Mitchell v. Oklahoma,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

5. *See Mitchell v. State,* 1997 OK CR 9, 934 P.2d 346.

6. *See Mitchell v. Oklahoma,* 521 U.S. 1108, 117 S.Ct. 2489, 138 L.Ed.2d 996 (1997).

7. *See Mitchell v. Ward,* 150 F.Supp.2d 1194 (W.D.Okla.1999).

violated *Brady v. Maryland*,[8] by failing to turn over exculpatory DNA evidence relating to samples taken from the victim and the crime scene.[9] The court granted habeas relief on Mitchell's convictions for rape and sodomy, since they were based upon this evidence and the presentation of highly misleading/untruthful testimony from Joyce Gilchrist, a forensic chemist employed by the Oklahoma City Police Department at the time.[10] The federal district court also strongly criticized the prosecutors in Mitchell's original trial regarding their treatment of this evidence.[11] The court vacated Mitchell's rape and sodomy convictions, but left his other convictions and sentences intact.[12]

¶ 4 Mitchell appealed to the United States Court of Appeals for the Tenth Circuit. The Tenth Circuit upheld Mitchell's first-degree murder conviction, but vacated his death sentence and ordered a new capital sentencing proceeding.[13] The Tenth Circuit concluded that if Mitchell's jury had not been presented the false and misleading evidence relating to the rape and sodomy charges—along with the improper prosecutorial argument—there was a reasonable probability that Mitchell would not have been sentenced to death.[14]

¶ 5 Pursuant to 21 O.S.2001, § 701.10a, a new jury was impaneled for the resentencing trial, which was held before the Honorable Susan P. Caswell on October 21–31, 2002. This time the jury found two aggravating circumstances: 1) the murder was "especially heinous, atrocious, or cruel"; and 2) the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." [15] The jury again recommended the death penalty, and the trial court so ordered. From this judgment and sentence, Mitchell appeals.[16]

¶ 6 The facts of this case were summarized in this Court's opinion on direct appeal, which is incorporated herein by reference.[17] Briefly stated, on January 7, 1991, Alfred Brian Mitchell found Elaine Scott alone at the Pilot Recreation Center in Oklahoma City.[18] The evidence presented at the resentencing established that Mitchell first attacked Scott near the Center's library, where

**8.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**9.** Mitchell's *Brady* claims were not raised in this Court, on either direct appeal or post-conviction.

**10.** This evidence and testimony are discussed in great detail in the district court's opinion. *See Mitchell*, 150 F.Supp.2d at 1221–30. In part, Gilchrist's testimony indicated that samples taken from vaginal and anal swabs of the victim, and also a cutting from her panties, contained sperm that was "consistent" with Mitchell or at least "inconclusive" as to him. In fact, Gilchrist knew at the time of Mitchell's original trial, based upon conversations with Special Agent Michael Vick of the FBI's DNA unit, (1) that the DNA recovered from the vaginal swab was consistent only with Elaine Scott, the victim, (2) that the DNA recovered from the victim's panties was consistent only with Phillip Taylor, Scott's boyfriend, and (3) that no DNA profile was obtained from the rectal swabs. *Id.* at 1224–25. Evidence developed at the federal evidentiary hearing indicated that even Gilchrist's own testing excluded Mitchell as the donor of the samples she tested. *Id.* at 1227 n. 48.

**11.** The court found that the State "labored extensively at trial to obscure the true DNA test results," and that the State's closing argument regarding the DNA results was "absolutely untenable." *Id.* at 1227.

**12.** *Id.* at 1230, 1263.

**13.** *See Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir.2001). The State did not appeal the district court's grant of relief on the rape and sodomy convictions, *id.* at 1044 n. 2, and the robbery and larceny convictions were not addressed in Mitchell's habeas appeal. *Id.* at 1044 n. 1.

**14.** *Id.* at 1065–66. The Tenth Circuit opinion noted that the misleading rape and sodomy evidence "impacted all three of the aggravating circumstances found by the jury." *Id.* at 1065.

**15.** *See* 21 O.S.1991, § 701.12(4) and (5), respectively. The jury rejected the third aggravating circumstance alleged, *i.e.*, the "continuing threat" aggravator. *See* 21 O.S.1991, § 701.12(7).

**16.** Mitchell's Petition in Error was filed in this Court on May 16, 2003. His brief was filed on February 25, 2004, and the State's brief was filed on October 15, 2004. Mitchell's reply brief was filed on November 4, 2004. Oral argument was held on October 11, 2005.

**17.** *See Mitchell*, 1994 OK CR 70, ¶¶ 2–3, 884 P.2d at 1191–92.

**18.** Only seventeen days earlier, on December 21, 1990, Mitchell had been released from the Lloyd Rader juvenile detention center, where he had been held until his eighteenth birthday, for the rape of eleven-year-old Maria Bustos.

a spot of blood, one of Scott's earrings, and a sign that she had been hanging were later found on the floor. Scott apparently ran for the innermost room of the Center's staff offices—as she had told her mother she would if she ever found herself in a dangerous situation at the Center—where there was a phone and a door that she could lock behind her. She almost made it.[19] Although the exact sequence of events is unclear, the State established that Scott's clothing was taken off and that a violent struggle ensued, in which Mitchell beat and battered Scott, using his fists, a compass, a golf club (which ended up in pieces), and a wooden coat rack. The forensic evidence—including the condition of Scott's nude, bruised, and bloodied body—established that she was moving throughout the attack, until the final crushing blows with the coat rack, which pierced her skull and ended her life.[20]

## ANALYSIS

■ ¶ 7 Mitchell's first three propositions of error all relate to the aggravating circumstance that his murder of Elaine Scott was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution," i.e., the "avoid arrest aggravator."[21] This Court has repeatedly held that this aggravating circumstance has two components. First, the State must establish that the defendant committed some "predicate crime," separate from the murder.[22] Second, the State must establish that the defendant killed the victim with the motive or intent of avoiding arrest or prosecution for this separate predicate crime.[23] We have recognized that the defendant's intent in this regard can be inferred from circumstantial evidence.[24]

¶ 8 In most cases in which the avoid arrest aggravator is found by the jury, the "predicate crime" is also charged as a separate crime and results in a separate conviction. Such cases typically involve first-degree malice murder convictions, with separate convictions for robbery,[25] burglary,[26] rape,[27] kid-

---

**19.** Blood found on the doorjamb and an injury to Mitchell's finger indicate that Scott reached the innermost office and slammed Mitchell's finger in the door as she tried to pull it shut behind her. The telephone was found on the desk, with the cord connecting it to the wall jack removed.

**20.** Mitchell's semen was discovered in a combing from Scott's pubic hair. This and other evidence suggesting that Mitchell committed a sexual crime against Scott are discussed *infra*.

**21.** See 21 O.S.1991, § 701.12(5).

**22.** See, e.g., Scott v. State, 1995 OK CR 14, ¶ 32, 891 P.2d 1283, 1294 ("To support a finding of this aggravating circumstance there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution."), *habeas relief granted on other grounds in Scott v. Mullin*, 303 F.3d 1222 (10th Cir.2002); *see also* cases listed in note 23. In *Hawkins v. State*, 1994 OK CR 83, ¶ 37, 891 P.2d 586, 596, we noted that the predicate offense must be "committed in close proximity to the murder."

**23.** See, e.g., Lott v. State, 2004 OK CR 27, ¶¶ 115–16, 98 P.3d 318, 348 ("To support a finding of this aggravating circumstance, the State must prove the defendant killed in order to avoid arrest or prosecution.... Furthermore, there must be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution.") (internal citations omitted), *cert.*

denied, 544 U.S. 950, 125 S.Ct. 1699, 161 L.Ed.2d 528 (2005); *Williams v. State*, 2001 OK CR 9, ¶ 83, 22 P.3d 702, 723 (same); *Alverson v. State*, 1999 OK CR 21, ¶ 75, 983 P.2d 498, 520 (listing "requirements" of avoid arrest aggravator as "(a) a predicate crime existed, apart from the murder, from which the defendant sought to avoid arrest/prosecution; and (b) the State presented evidence establishing the defendant's intent to kill in order to avoid arrest/prosecution"); *LaFevers v. State*, 1995 OK CR 26, ¶ 48, 897 P.2d 292, 311 (finding avoid arrest aggravator constitutional because it "requires a predicate crime separate from the murder for which a defendant seeks to avoid arrest," and also "requires a determination of the state of mind of the defendant"); *see also Barnett v. State*, 1993 OK CR 26, ¶ 30, 853 P.2d 226, 233 (per curiam) ("This aggravating circumstance, by definition, requires that there be a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution.").

**24.** *Lott*, 2004 OK CR 27, ¶ 115, 98 P.3d at 348; *LaFevers*, 1995 OK CR 26, ¶ 48, 897 P.2d at 311.

**25.** See, e.g., McElmurry v. State, 2002 OK CR 40, 60 P.3d 4; *Pickens v. State*, 2001 OK CR 3, 19 P.3d 866; *Wackerly v. State*, 2000 OK CR 15, 12 P.3d 1; *Alverson*, 1999 OK CR 21, 983 P.2d 498; *see also Brown v. State*, 1998 OK CR 77, 989 P.2d 913 (discussed *infra*).

**26.** See, e.g., Salazar v. State, 1998 OK CR 70, 973 P.2d 315; *Patton v. State*, 1998 OK CR 66, 973

napping,[28] or one or more other murders.[29] This separate crime (or crimes) then also constitutes the predicate crime for the avoid arrest aggravator in the second stage of the capital trial. Similarly, in cases in which the capital defendant is charged with first-degree felony murder, the crime that serves as the underlying felony for the murder conviction can also serve as the predicate crime for the avoid arrest aggravator in the second stage.[30]

¶ 9 In either of these typical scenarios, a jury (or trial court) will have found the defendant guilty, beyond a reasonable doubt, of the crime alleged as the avoid-arrest "predicate crime" before the capital stage even commences. In other cases the predicate crime relied upon is not separately charged or specifically found by a jury during the first stage, but the evidence that such a separate crime occurred—and what the separate crime relied upon is—is not in doubt.[31]

¶ 10 The context of Mitchell's capital resentencing, however, was very different from these typical scenarios. In Mitchell's original trial, he was convicted of rape (and also sodomy), which then served as the predicate crime to support the avoid arrest aggravator in the second stage of his trial.[32] Mitchell's rape and sodomy convictions have been vacated, however, and the State has chosen not to reprosecute him for these crimes—and

now has abandoned the sodomy allegation entirely—proceeding instead directly to a retrial of Mitchell's capital sentencing. Although this Court has previously found that the State is not required to separately charge the crime relied upon as the avoid-arrest predicate crime,[33] the history of Mitchell's case raises numerous questions about the manner in which the State was allowed to allege, argue, and prove the avoid-arrest predicate crime(s) in this case.

¶ 11 In Proposition I, Mitchell challenges the argument that the State was allowed to make in support of the avoid arrest aggravator, particularly the claim that he either "raped" Scott or committed some non-specific "sexual assault" against her. He also challenges the adequacy of the jury instructions regarding this aggravator, under the specific circumstances of his trial, and in light of the Supreme Court's decision in *Ring v. Arizona*[34] and subsequent cases.

¶ 12 We begin by addressing Mitchell's claim that the State should not have been allowed to argue or rely upon "rape" as the predicate crime for the avoid arrest aggravator in his case. As noted, the State chose not to reprosecute Mitchell for rape or sodomy after the federal district court vacated those convictions.[35] After the Tenth Circuit vacat-

---

P.2d 270; *Cleary v. State*, 1997 OK CR 35, 942 P.2d 736.

**27.** *See, e.g., Mollett v. State*, 1997 OK CR 28, 939 P.2d 1.

**28.** *See, e.g., Hawkins*, 1994 OK CR 83, 891 P.2d 586.

**29.** In cases involving multiple victims, we have found that the initial murder can serve as the predicate crime supporting the avoid arrest aggravator finding for the subsequent murder(s). *See, e.g., Anderson v. State*, 1999 OK CR 44, ¶ 46, 992 P.2d 409, 422–23; *Thornburg v. State*, 1999 OK CR 32, ¶ 40, 985 P.2d 1234, 1247–48; *Hooper v. State*, 1997 OK CR 64, ¶ 42, 947 P.2d 1090, 1106–07; *DeLozier v. State*, 1998 OK CR 76, ¶ 38, 991 P.2d 22, 30; *Smith v. State*, 1996 OK CR 50, ¶ 48, 932 P.2d 521, 536.

**30.** *See, e.g., DeRosa v. State*, 2004 OK CR 19, ¶¶ 85–89, 89 P.3d 1124, 1153–54 (armed robbery), *cert. denied*, 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005); *Hammon v. State*, 2000 OK CR 7, ¶ 35, 999 P.2d 1082, 1091–92 (armed robbery); *Carter v. State*, 1994 OK CR 49, ¶¶ 50–51, 879 P.2d 1234, 1250–51 (robbery).

**31.** *See, e.g., Lott*, 2004 OK CR 27, ¶ 116, 98 P.3d 318, 348 (completed rapes as predicate crimes); *Frederick v. State*, 2001 OK CR 34, ¶¶ 116–17, 37 P.3d 908, 939–40 (theft/robbery as predicate crime); *Scott*, 1995 OK CR 14, ¶¶ 32–33, 891 P.2d 1283, 1294–95 (robbery as predicate crime). And if there is doubt about the occurrence of a separate crime, this Court has reversed the avoid arrest aggravator. *See, e.g., Williams*, 2001 OK CR 9, ¶ 85, 22 P.3d 702, 723; *Snow v. State*, 1994 OK CR 39, ¶ 33, 876 P.2d 291, 299.

**32.** Although Mitchell was also convicted of armed robbery and larceny of an automobile—and these convictions remain valid—the State relied upon rape/sodomy as the avoid arrest aggravator's predicate crime in Mitchell's first trial.

**33.** *See, e.g., Cleary v. State*, 1997 OK CR 35, ¶ 68, 942 P.2d 736, 751 (plurality opinion).

**34.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**35.** In fact, the State did not even appeal the district's court's *Brady*-based decision in this regard.

ed Mitchell's death sentence, however, the State did reinitiate death penalty proceedings against him, though it initially neglected to file a new Bill of Particulars. Before the resentencing, Mitchell filed a Motion to Strike the Avoid Arrest Aggravator for "Insufficient Evidence" and a Motion in Limine "to prohibit the Prosecutor or any witnesses called by the State from mentioning, arguing, or inferring the deceased, Elaine Scott, was vaginally or anally raped or sodomized," in light of the federal court decision vacating those convictions and the State's decision not to retry those charges.[36] The State filed no response to either of these motions.[37]

¶ 13 During a lengthy pre-trial hearing on Mitchell's motions, defense counsel argued that because the State had not appealed the vacating of the rape and sodomy convictions and had chosen not to reprosecute those charges, the State should not be allowed to argue that Mitchell had, in fact, *raped* Elaine Scott or to use such a rape as the predicate crime for the avoid arrest aggravator.[38] Mitchell's counsel acknowledged that the State would be allowed to present the physical evidence that suggested a possible sexual crime—in particular, the fact that Scott was found nude, that Mitchell's semen was found in combings of her pubic hair, and that she had certain bruising. Yet defense counsel insisted, relying primarily upon *Cummings v. State*,[39] that the State should not be allowed

to rely upon "rape" as a predicate crime for the avoid arrest aggravator.[40]

¶ 14 The State maintained that it should be allowed to argue that a rape occurred and to rely on such rape as a possible predicate crime: "[T]he evidence is going to be that the defendant killed her as a result of a rape or a sexual assault."[41] Although the prosecutor purported to accept the federal courts' *Brady*-based habeas rulings, and acknowledged that the vaginal swabs taken from the victim did not contain Mitchell's DNA, he mocked the implication in the federal opinions that the evidence did not support a rape charge: "[T]he absence of trauma to the vagina was understood apparently as being evidence that a rape had not occurred. This court knows from your experience as a trial lawyer and now a judge that that is an utterly meaningless fact."[42] The State attempted to distinguish *Cummings* and maintained that it should be allowed to argue that a rape occurred, which could serve as the basis for the avoid arrest aggravator.

¶ 15 The trial court accepted the State's argument, overruled Mitchell's motions, and ruled that the State could argue that a rape occurred and that Mitchell murdered Scott to avoid being arrested or prosecuted for that rape. The court found that it would be "ludicrous" to allow the State to present the physical evidence of some kind of sexual assault, but then limit the State's ability to "argue any reasonable inference that you

36. Mitchell also filed a "Motion to Make Bill of Particulars More Definite and Certain," since the State did not file a new bill.

37. The State likewise failed to file any written response to clarify what aggravating evidence it would rely on to support the aggravators alleged, until the day Mitchell's resentencing began.

38. During the hearing the prosecutor indicated that the State no longer believed that Scott was anally sodomized and that no such evidence or argument would be presented in the resentencing.

39. 1998 OK CR 45, 968 P.2d 821.

40. Mitchell did not challenge or question the State's right to argue that some other crime, short of rape, had occurred or to rely upon such other crime to support the avoid arrest aggravator.

41. The State never indicated that it would rely solely on its belief that Scott was raped. Instead, the State always indicated that it should be allowed to argue that either a rape *or* some "sexual assault" had occurred, which was the reason that Mitchell killed Scott. The State was unwilling to concede any limitation, however, on its right to argue that a completed rape had occurred.

42. The prosecutor summarized the evidence suggestive of some kind of sexual assault and stated, "we do not think it requires a great leap of faith to draw the inference that penetration occurred." The prosecutor also stated: "[W]e do believe that the evidence that is left before the court does support an inference that a sexual assault occurred, either an attempted rape or we believe the evidence supports a rape with penetration and ejaculate left outside the vagina, as often is the case in these assaults...."

could draw from that." The court concluded that the State's evidence of a rape "certainly rise[s] to the level of the preponderance of evidence the State is required to present that evidence." [43]

¶ 16 During the resentencing the State repeatedly invoked its theory that Mitchell raped Scott and then murdered her to avoid being prosecuted for that rape.[44] The prosecutor referred to this rape theory of the case multiple times during voir dire,[45] began his opening statement with it,[46] and then invoked it again during closing argument.[47]

43. On the day Mitchell's resentencing began, the State filed an Amended Notice of Evidence in Aggravation to be Offered in Support of Death Penalty. For the avoid arrest aggravator, the State indicated that it would "prove that Elaine Scott was sexually assaulted by Mitchell while she was still alive," and that she "was murdered by the defendant because she could have identified Mitchell as the man who sexually assaulted her." The State did not list any other crime(s) as possible support for this aggravator. For the "heinous, atrocious, or cruel" aggravator, the State alleged that it would prove that Mitchell "raped, anally sodomized and then murdered Elaine Marie Scott by beating her to death." During a hearing just before trial began, however, the State again stated that it would make no reference to anal sodomy during the trial, and it did not do so.

44. The State relied on essentially the same theory of the case as it had in the original trial, i.e., that Mitchell "learned his lesson" from sparing the life of Maria Bustos—the eleven-year-old girl whom Mitchell raped when he was fifteen—and then being caught and punished for raping her.

45. During voir dire the prosecutor was allowed to argue, over defense objection, that rapes often did not produce any definitive injury to the victim, and then to question whether jurors would have a hard time accepting that a rape had occurred, without such evidence of trauma. For example, the prosecutor stated: "And there is a lot of thought out there by a lot of folks that if a rape occurs, there's going to be physical—if you watch TV, you think every time a rape occurs or a sexual assault occurred, that there will definitely be tearing of certain tissues and other things like that. And are you—if you hear evidence in the case that suggests in the overwhelming majority of sexual assaults—." At this point defense counsel objected, but the court overruled the objection, and the prosecutor continued the line of argument/questioning, suggesting that the State would produce evidence "to the effect that—in a very, very significant percentage of sexual assault cases, particularly with younger victims, ... there is no such tearing." The State's voir dire references to rape were so

¶ 17 In *Cummings v. State*,[48] the State relied upon two crimes as the predicate crime for the avoid arrest aggravator, for the defendant's murder of Melissa Moody: (1) the defendant's rape of Melissa, and (2) his murder of her mother.[49] We concluded that *neither* of these crimes could be used as the predicate crime for the aggravator in that case. This Court wrote:

> We find merit to Appellant's argument that evidence of the dismissed [child abuse/rape] charge should not have been used to support [the avoid arrest] aggravating cir-

prominent that at least one juror apparently accepted the alleged rape as an established fact. *See* note 109 *infra* (quoting Prospective Juror E.M.).

46. After reading the Bill of Particulars, the prosecutor stated: "The people who this defendant should—should respect, should embrace, should protect are the very people who he victimizes, the people who he—that's the type of person who he rapes, that's the type—." Defense counsel objected, but the objection was overruled.

47. Mitchell repeatedly re-raised his objection to the State being allowed to argue or infer that he raped Scott; and the trial court consistently overruled the objection.

48. 1998 OK CR 45, 968 P.2d 821.

49. *Cummings* involved the double murder of the defendant's sister, Judy Mayo, and her daughter, Melissa Moody. The State prosecuted Cummings (who had two wives) for both murders by presenting evidence that his second wife (Juanita) shot Judy because Cummings told her to, and that when he later returned home, Cummings and his first wife (Sherry) disposed of Judy's body and then took Melissa out into the country, where Cummings alone killed her. Cummings was also charged with child abuse, based upon Juanita's testimony that before Melissa was taken away, Cummings ordered his wives to undress her and to remain in the room while he raped her. *Id.* at ¶¶ 7–13, 968 P.2d at 827–29. This count, however, was dismissed by the trial court at the end of the first stage of trial. *Id.* at ¶ 1 n. 1, 968 P.2d at 826 n. 1.

On appeal, this Court reversed the defendant's conviction for Judy's murder, finding that both wives were accomplices to this crime, whose testimony was not adequately corroborated by independent evidence. *Id.* at ¶¶ 18–21, 968 P.2d at 829–30. We affirmed his conviction for Melissa's murder, however, finding that Juanita was not an accomplice to this murder and that her testimony adequately corroborated that of Sherry. *Id.* at ¶¶ 22–23, 968 P.2d at 830–31.

cumstance. The trial court found as a matter of law that Appellant was not guilty of the crime of child abuse as charged and accordingly, the alleged acts that the State relied upon to support this charge should not be used to support this aggravating circumstance. Similarly, because this Court found ... that the evidence was insufficient to support Appellant's conviction for killing Judy Mayo, it follows that the evidence must also be insufficient to support a finding that Appellant killed Melissa Moody to avoid arrest or prosecution for this crime.[50]

We concluded that under those circumstances, the State's evidence was insufficient to support the avoid arrest aggravator.[51]

 ¶ 18 *Cummings* compels us to conclude that the trial court erred in allowing the State to argue "rape" as the avoid-arrest predicate crime in the current case. The *Cummings* holding that the murder of Judy Mayo could not be used as a predicate crime for the avoid arrest aggravator is particularly significant.[52] Unlike the rape of Melissa Moody—about which there was no physical evidence and no certainty that the crime had actually occurred—there could be no doubt that Judy Mayo was violently killed.[53] This Court overturned the defendant's conviction for Judy's murder based entirely upon Oklahoma's requirement that accomplice testimony be independently corroborated, rather than a "garden variety" finding of insufficient evidence.[54] Consequently, the holding that Judy's murder could not serve as the avoid-arrest "predicate crime" for Melissa's murder provides strong support for this Court's current conclusion.[55] We hold that when the State's evidence is (or would be) inadequate to support a conviction for a particular crime, such crime also *cannot* serve as the predicate crime for the avoid arrest aggravator.[56]

¶ 19 The State emphasizes in its brief that the grants of habeas relief in this case were premised upon violations of *Brady v. Maryland*.[57] Hence, the State argues that there has been no formal court finding (as there was in *Cummings* ) that the (legitimate) evidence in this case is legally insufficient to establish that Mitchell raped Elaine Scott.[58]

**50.** *Id.* at ¶ 50, 968 P.2d at 836.

**51.** *Id.* ("Accordingly, this aggravating circumstance must fail.").

**52.** The parties focus their *Cummings* analysis on the use of Melissa's "rape" as the predicate crime—presumably because this case also involves a possible rape. We conclude, however, that the *Cummings* analysis of Judy's murder as the predicate crime is even more instructive.

**53.** Judy's body was found floating in a small pond, wrapped in a quilt and mattress pad. She had gunshot wounds to her head and neck. Melissa's skeletal remains were not found until the following month; an exact cause of death could not be determined. *Id.* at ¶ 4, 968 P.2d at 827.

**54.** *See id.* at ¶¶ 18–21, 968 P.2d at 829–30. Our affirming of the defendant's conviction for Melissa's murder, upon finding that Juanita was *not* an accomplice to that crime, suggests that were it not for the accomplice corroboration rule, we would have upheld his conviction for Judy's murder too. *See id. at* ¶¶ 22–24, 968 P.2d at 830–31; *see also Pink v. State*, 2004 OK CR 37, ¶¶ 14–24, 104 P.3d 584, 590–93 (discussing and applying accomplice corroboration rule).

**55.** All five judges that voted in *Cummings* agreed that the avoid arrest aggravator had to be struck down, because neither the rape of Melissa nor the murder of Judy were adequately established.

*See Cummings*, 1998 OK CR 45, ¶ 50, 968 P.2d at 836; *see also id.* at ¶ 3, 968 P.2d at 839 (Lumpkin, J., concurring in result) ("I agree that the alleged rape, a crime of which Appellant was acquitted, could not be used as the predicate crime to support the aggravator of committing a murder for the purpose of avoiding or preventing a lawful arrest or prosecution...."). Although one judge maintained that the rape evidence could have been admissible to support the continuing threat aggravator (as an "unadjudicated offense"), *id.*, no judge questioned the majority opinion's predicate crime analysis.

**56.** The State's reliance upon *Hogan v. State*, 1994 OK CR 41, 877 P.2d 1157, *habeas relief granted on other grounds in Hogan v. Gibson*, 197 F.3d 1297 (10th Cir.1999), is entirely misplaced. Although the avoid arrest aggravator was alleged in that case, it was rejected by the jury. *Id.* at ¶ 33, 877 P.2d at 1164. Hence this Court did not discuss the requirements of the avoid arrest aggravator in that decision. The language invoked by the State related only to the use of evidence to establish "motive" in the more general sense. *See id.* at ¶ 19, 877 P.2d at 1161.

**57.** *See Mitchell*, 150 F.Supp.2d at 1230; *Mitchell*, 262 F.3d at 1065–66.

**58.** We note that the federal district court did, in fact, find that the legitimate evidence in the case is insufficient to support a rape conviction, and

The resentencing trial court needed to resolve this issue, in order to rule upon Mitchell's motions and his numerous objections to the State's references to "rape" and its reliance upon rape as the avoid-arrest predicate crime. Yet the trial court declined to make this finding, and ruled, based only upon a "preponderance" standard, that the State's evidence was legally sufficient to allow it to argue that Mitchell raped Scott and that he killed her to avoid being arrested or prosecuted for that rape.[59]

¶ 20 This Court concludes, upon reviewing the remaining evidence in this case, that the State's evidence could *not* support a conviction for rape, because there is simply no evidence of penetration,[60] which is a required element of this crime.[61] This is an evidentiary determination, of the kind courts are regularly called upon to make, and which the trial court was called upon to make. This Court does not know, in fact, whether or not Alfred Brian Mitchell raped Elaine Scott. It

is entirely possible that he did. It is also entirely possible, and consistent with the evidence, that Mitchell did everything in his power to rape Scott, but that he simply could not overcome her desperate and powerful resistance, in order to "succeed" in actually raping her.[62]

¶ 21 While Mitchell's moral culpability may well be the same whether or not he was able to complete the intended rape, his legal culpability is not. The State simply does not have the evidence to establish the crime of rape.[63] Hence, under *Cummings*, the State should not have been allowed to argue that Mitchell killed Scott in order to avoid arrest or prosecution for raping her, *i.e.*, rape could not serve as the predicate crime for this aggravator. And the trial court abused its discretion in overruling Mitchell's motion in limine and in allowing the State to rely upon rape as a possible predicate crime for the avoid arrest aggravator.[64]

---

the federal circuit court came close to doing so. *See* 150 F.Supp.2d at 1229–30 ("The jury did not receive a truthful representation of the evidence on the rape and sodomy charges due to constitutional violations by the State. It is therefore this Court's opinion that the *Winship* standard could not be met if the jury had been given an accurate picture of the facts.") (after noting that *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), requires that crimes be proven "beyond a reasonable doubt"); 262 F.3d at 1065 ("[T]here is at least a reasonable probability that if the defense had been provided the withheld evidence, it would have succeeded in getting those charges dismissed prior to the trial.").

59. The trial judge, perhaps due to her experience as a prosecutor of sex crimes, stated that she believed the jury would draw the conclusion that Mitchell had raped Scott, based upon the evidence of his semen in her pubic hair and her bruising. Her reference to the "preponderance" standard appears based upon a misreading of a separate writing in *Cummings*, which discussed this standard in connection with the continuing threat aggravator. *See* 1998 OK CR 45, ¶ 3, 968 P.2d at 839 (Lumpkin, J., concurring in result).
 It is true that this Court has held that, under certain circumstances, the State can present evidence of "unadjudicated offenses" during a capital sentencing, and that such offenses need only be proven by a "preponderance" of the evidence. It should be emphasized, however, that these holdings apply only to cases involving the continuing threat aggravator, which, unlike the avoid arrest aggravator, does not require a "predicate crime." *See, e.g., Johnson v. State*, 1982 OK CR 37, ¶¶ 25–32, 665 P.2d 815, 821–23;

*Woodruff v. State*, 1993 OK CR 7, ¶¶ 84–86, 846 P.2d 1124, 1143–44. Although prior criminal activity is relevant to both aggravators, only the avoid arrest aggravator requires a finding that a prior crime was actually committed, which in turn requires evidence sufficient to establish that crime beyond a reasonable doubt.

60. The State conceded at oral argument that there is no evidence of penetration in this case.

61. *See* 21 O.S.1991, § 1111(A); 21 O.S.1991, § 1113; *Miller v. State*, 65 Okla.Crim. 26, 82 P.2d 317, 322 (1938) ("Penetration is necessary ... to complete the crime of rape."); *Vaughn v. State*, 1985 OK CR 29, ¶ 7, 697 P.2d 963, 966.

62. Maria Bustos testified that when Mitchell raped her, she basically "froze" and did not resist. The crime scene in this case leaves no doubt about Scott's active and determined resistance.

63. This Court's findings in the original direct appeal of this case, that the evidence was sufficient to support Mitchell's convictions for rape and sodomy, are obviously *not* res judicata in the current appeal, since those findings were based upon *Brady* violations that the State now admits, which were not even discovered until after the original appeals in this Court.

64. This finding resolves the portion of Mitchell's Proposition III claim that alleges that because the evidence of rape was insufficient, the State presented insufficient evidence to establish the

¶ 22 Within Proposition I, Mitchell also asserts that the State should have been required to allege a specific, statutorily-established crime as the avoid-arrest predicate crime, rather than simply allege a "sexual assault." [65] In addition, Mitchell asserts that the State should have been required to establish each of the elements of the avoid-arrest predicate crime "beyond a reasonable doubt," in the same manner as if the predicate crime

were being individually prosecuted. [66] Because this Court is already striking down the avoid arrest aggravator, based upon the State's reliance upon "rape" as the predicate crime, as well as the State's failure to give notice of its intent to rely upon armed robbery and larceny of an automobile as the predicate crime (discussed in Proposition II), this Court declines to decide these issues in the current case. [67]

avoid arrest aggravator. The remainder of Proposition III is addressed *infra*.

**65.** Although the term "sexual assault" has a commonly understood meaning and is widely recognized as describing some kind of sex-related crime, Oklahoma does not have a particular, statutorily-established crime of "sexual assault," per se. Rather, the phrase is understood to designate a class or category of various, separate, sex-related crimes.

**66.** The current uniform jury instruction, which was used in Mitchell's trial, states as follows:

> The State has alleged that "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." This aggravating circumstance is not established unless the State has proved *beyond a reasonable doubt* that:
> First, there was another crime separate and distinct from the murder; and
> Second, the defendant committed the murder with the intent to avoid being arrested or prosecuted for that other crime.

OUJI–CR 4–75 (emphasis added). Hence although Oklahoma juries are already required to find, beyond a reasonable doubt, that there was "another crime" separate from the murder (*i.e.*, the predicate crime), our uniform instructions do not require that the jury be told the elements of that other crime or that each of these elements must also be proven beyond a reasonable doubt.

**67.** Personally, I would require that the avoid-arrest predicate crime be a specific statutory crime and that the jury be required to find each of the elements of that crime, beyond a reasonable doubt, at some point during the capital trial. Although this Court has not previously held that the predicate crime must be a statutory crime, we have never affirmed the avoid arrest aggravator where the predicate crime relied upon was something other than a statutorily-established crime, akin to the "sexual assault" allegation in the current case. Furthermore, requiring a more specific jury finding regarding the elements of the predicate crime is consistent with the United States Supreme Court's emerging *Apprendi/Ring* jurisprudence. *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring v. Arizona*, 536 U.S. 584, 122

S.Ct. 2428, 153 L.Ed.2d 556 (2002); *see also Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004); *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).

The State asserts in its brief: "Although to prove the aggravating circumstance of murder to avoid arrest, the State must prove a crime separate and distinct from the murder, the State is not required to prove each element of that crime, as it is not the crime for which the defendant is being sentenced." While it may make sense to a non-lawyer to talk about proving a "crime" without proving each element of that crime, such talk does not make sense in the legal context, particularly on appellate review. In Oklahoma, all crimes are statutorily established and defined. *See* 21 O.S.2001, § 1 ("This chapter shall be known as the penal code of the State of Oklahoma"); 21 O.S.2001, § 2 ("No act or omission shall be deemed criminal or punishable except as prescribed or authorized by this code. The words 'this code' as used in the 'penal code' shall be construed to mean 'Statutes of this State.' "). Consequently, in order to establish that a "crime" has been committed—whether the State is attempting to garner a conviction or establish the "predicate crime" component of the avoid arrest aggravator—the State should be required to establish each element of that crime beyond a reasonable doubt. Furthermore, the jury should be required to make a specific finding regarding what crime(s) constitute the predicate crime for which the defendant was attempting to avoid arrest or prosecution at the time of the murder.

I recognize that this Court's post-conviction opinion in *Brown v. State*, 2003 OK CR 7, 67 P.3d 917, declined to find that *Ring* requires this conclusion. Yet the context of that decision must be looked at carefully. In *Brown*, this Court reversed the defendant's original jury conviction for armed robbery, in order to avoid a double jeopardy problem in affirming his felony murder conviction based upon that same robbery. There was no doubt about the sufficiency of the evidence underlying the jury's finding of armed robbery, which also served as the predicate crime for the avoid arrest aggravator. *Id.* at ¶ 8, 67 P.3d at 919. Hence we concluded that it

¶ 23 The separate opinion in this case, authored by Judge Lumpkin and joined by Judge Taylor, correctly observes that the defendant's motivation for killing is the focus of the avoid arrest aggravator.[68] The separate opinion goes too far, however, when it asserts that this aggravator "must be viewed through the eyes of the defendant,"[69] such that all that is required to satisfy the aggravator is that the defendant commit acts that the defendant "believes"/"thinks" could lead to his arrest or prosecution.[70] Although this approach may have some initial intuitive appeal, it is contrary to the language of the avoid arrest aggravator and the precedents of this Court.

¶ 24 The statutory language of the aggravator requires that the defendant murder the victim "for the purpose of avoiding or preventing a lawful arrest or prosecution."[71] The use of the word "lawful" in this context establishes that the applicability of the aggravator does not depend merely upon what is going on inside the head of the murderer, but also on the actual state of *the law* and how it applies to the act(s) for which the murderer fears being held accountable. If a defendant cannot be lawfully arrested or prosecuted for the act(s) for which he is trying to avoid being arrested/prosecuted, this aggravating circumstance does *not* apply—no matter how sincere the defendant was in his mistaken understanding of the law and no matter how morally reprehensible the murder.[72]

would be "frivolous" to find that *Ring* required that the same jury that had found Brown guilty of armed robbery in the first stage should have been required to again specifically find, as part of its avoid-arrest aggravator analysis, that he had committed that same armed robbery. *Id.*

Mitchell's claim is far from frivolous. In his case it is entirely unclear what exact predicate crime the State was relying upon, whether that predicate crime was supported by sufficient evidence, what predicate crime the jury had in mind when it found the avoid arrest aggravator, whether that predicate crime was supported by sufficient evidence, or whether the "predicate crime" relied upon was even a crime at all. Thus Mitchell's resentencing reveals that, in some cases, a specific jury finding regarding the predicate crime is necessary in order to comport with due process and the Eighth Amendment. I would overturn *Brown* to the extent that it fails to recognize the necessity of this kind of jury fact-finding, in cases such as the current one.

I would find that in cases where the crime (or crimes) relied upon as the avoid-arrest predicate crime is not found by the jury during the guilt stage *and* in cases where more than one crime is alleged to constitute the predicate crime, the jury should be required to specifically designate the predicate crime(s) upon which its finding of the avoid arrest aggravator is based. Although the State could rely upon more than one predicate crime, the jury should be required to unanimously agree on at least one particular predicate crime, for which there is sufficient evidence to establish it beyond a reasonable doubt. I would also require that the State provide notice of the specific predicate crime(s) upon which it intends to rely, within its notice regarding aggravating evidence. *See* 21 O.S.2001, § 701.10(C). Such requirements would avoid unnecessary confusion and uncertainty in future cases, ensure that jurors understand and agree upon any finding of the avoid arrest aggravator, and facilitate judicial

review by this Court, including mandatory sentence review, without unduly burdening either the parties or the jury.

**68.** *See* Separate Opinion, Lumpkin, J., ¶ 1. On the other hand, the opinion's assertion that the "prior violent felony" aggravator somehow overlaps with the avoid arrest aggravator, *see id.*, is certainly incorrect. The prior violent felony aggravator is directed at the problem of recidivism and looks at whether, at the time of the murder, the killer already had violent felony *convictions*. It has nothing to do with the killer's *motivation* at the time of the murder, which we all agree is at the heart of the avoid arrest aggravator.

**69.** *Id.* at ¶ 3.

**70.** The Separate Opinion states:

[U]nder the statutory language of this aggravator, a defendant need only to have committed acts at the time which caused him/her to *believe* could have led to his/her arrest or prosecution. A defendant is not required to be vested with the knowledge of a lawyer and be able to outline the elements of a crime before the aggravator is applicable, only that he/she has committed an act that he/she *thinks* may cause him/her to be arrested or prosecuted. That is sufficient evidence to satisfy this aggravator.

*Id.* at ¶ 8.

**71.** *See* 21 O.S.1991, § 701.12(5).

**72.** Although counsel for the State suggested at oral argument that people are arrested "all the time" for things that are not crimes, it is well established that in order for an arrest to be "lawful," it must be based upon probable cause to believe that the arrested person has committed (or is committing) some particular crime. *See*

¶ 25 As summarized earlier, the presence of a "predicate crime" has long been recognized by this Court as one of the two requirements of the avoid arrest aggravating circumstance.[73] The approach advocated by today's separate opinion would effectively eliminate this requirement, since it would require only an examination of the defendant's motivation. Despite the challenges presented by the current case, the separate opinion provides neither authority nor a compelling argument to cause this Court to depart from our consistent caselaw requiring a "predicate crime" that is "separate from the murder."[74]

¶ 26 In Proposition II, Mitchell challenges the fact that the trial court allowed the State to argue that he killed Scott in order to avoid arrest or prosecution for stealing her purse and her car, even though the State did not give any pre-trial notice that it would rely on these crimes to help support the avoid arrest aggravator. In fact, the State did not even bring up Mitchell's convictions for armed robbery and larceny of an automobile—or the possibility of relying on either of them as the avoid arrest predicate crime—until after the defense had presented all of its evidence and rested.[75]

¶ 27 The State acknowledged that it had given no notice of its intent to rely upon these crimes to support the avoid arrest aggravator, but argued that Mitchell had adequate notice of the convictions and the underlying facts, and that unless Mitchell could provide a specific case to the contrary, the State should be allowed to rely upon the robbery and larceny convictions to support the aggravator. The trial court accepted the State's argument, noting that "all the parties know the defendant was convicted of these crimes," and concluded: "Anyway, in the absence of you providing any case to the contrary, I believe that you have had sufficient notice through an abundance of evidence through the entirety of the first trial to everything that occurred in that first trial."[76] Consequently, during the State's closing argument, the prosecutor argued that Mitchell murdered Scott, at least in part, to avoid arrest or prosecution for his crimes of stealing her purse and her car.

¶ 28 Oklahoma law requires that the State provide notice of the evidence that it intends to rely upon to support the aggravating circumstances alleged: "Only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible."[77] This Court has recognized that although the State is not required to give a detailed description of all the evidence that will be offered in the second stage, the State's notice must allow the defendant the opportunity to present a defense to or an explanation of the evidence offered in support of the aggravating circumstances.[78] The State argues that Mitchell had notice that the State was seeking to establish the avoid arrest aggravator and that Mitchell knew about the evidence supporting the rob-

---

*generally United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

73. *See supra* notes 22 & 23 and accompanying text.

74. *See id.*

75. During an instruction conference prior to the State's presentation of a rebuttal witness, the trial court noted that (at the State's request) it would instruct the jury that Mitchell had previously been convicted of armed robbery and larceny of an automobile. Defense counsel objected, noting that these convictions had not been previously referenced in the trial. The State then announced that it would rely upon these crimes to help support the avoid arrest aggravator. Defense counsel vigorously objected, noting that there had been absolutely no previous notice of this plan.

76. Throughout Mitchell's trial, when defense counsel raised an objection to something the prosecutors were doing or saying, the State repeatedly took the position that unless counsel could invoke a *particular* case, on the spot, that *specifically* prohibited whatever was being challenged, the prosecutors should be allowed to proceed as they willed. And the trial court consistently accepted this argument—putting the burden on Mitchell to establish, with authority from this Court, that the challenged action or argument was prohibited, rather than simply evaluating the defense objection on its merits.

77. 21 O.S.2001, § 701.10(C).

78. *See, e.g., Littlejohn v. State,* 2004 OK CR 6, ¶ 17, 85 P.3d 287, 295, *cert. denied,* 543 U.S. 947, 125 S.Ct. 358, 160 L.Ed.2d 261 (2004); *Black v. State,* 2001 OK CR 5, ¶ 92, 21 P.3d 1047, 1077; *Johnson v. State,* 1982 OK CR 37, ¶ 36, 665 P.2d 815, 823.

bery and larceny convictions, some of which came in during the resentencing, and all of which was purportedly "incorporated" from the first trial.[79] Yet Mitchell had no notice whatsoever that the State intended to rely upon his robbery and larceny convictions as possible predicate crimes for the avoid arrest aggravator.[80]

¶ 29 Hence the State's notice of its intent to rely upon the armed robbery and larceny convictions to support the avoid arrest aggravator was entirely inadequate, and the trial court abused its discretion in allowing the State to do so over defense objection. It violated due process to allow the State to rely upon these crimes, and thereby substantially expand its avoid arrest theory, after Mitchell had already finished cross-examining the State's witnesses and presenting his own case. Furthermore, in the context of Mitchell's trial, where there was already so much uncertainty surrounding what the State was relying upon as the "predicate crime," Mitchell was certainly prejudiced by this error.

¶ 30 This Court notes that the actual evidence that Mitchell killed Scott to avoid being arrested or prosecuted for stealing her purse or her car is minimal, at best. Although there was some evidence presented during the resentencing regarding the robbery of Scott's purse, this evidence was not focused upon or substantially developed; hence its significance as a motivating factor for the murder is nebulous. Regarding the theft of Scott's car, this Court is unaware of any evidence suggesting that this theft occurred prior to the murder or that it played any motivating role in the murder at all. If either of these crimes is to be used as a predicate crime for the avoid arrest aggravator at any further resentencing, Mitchell must be provided notice of the State's intention to do so and of the factual evidence upon which the State will rely.

¶ 31 We note that certain language in the opinion from the Tenth Circuit Court of Appeals suggests that court's expectation that Mitchell's resentencing would be free of any evidence suggesting that Mitchell committed a sexual crime against Scott.[81] We do not share this perspective. This Court recognizes and deplores the serious *Brady* violations and related misconduct committed by the State in connection with Mitchell's original trial. Nevertheless, the State's actions in pursuing this case have done nothing to diminish or absolve the horrifying abuse and murder that Elaine Scott endured at the hands of Alfred Brian Mitchell.

79. Although the State requested that all of the evidence from the first stage of Mitchell's original trial be "incorporated" into his resentencing, the record does not suggest that Mitchell's resentencing jury actually received any evidence beyond what was formally presented and admitted during the resentencing. The record before this Court contains no transcripts or exhibits from the original trial (except those exhibits that were actually reused during the resentencing), nor does it suggest that the jury received any additional material. This Court notes that the original first-stage evidence includes the improper testimony of Joyce Gilchrist, which, obviously, would *not* have been appropriate for the resentencing jury's consideration.

80. During the original trial the State relied solely upon rape and sodomy as the predicate crimes.

81. For example, that court wrote:

Sexual assault charges are by their nature highly inflammatory and prejudicial. . . . [T]here is a qualitative difference in terms of culpability between a defendant who rapes and sodomizes a victim and then kills her to silence her, and a defendant who kills in a fit of rage. Had the rape and sodomy charges not been before the jury, the state would have been unable to infuse the murder with prior sexual abuse or to argue that Mr. Mitchell killed the victim in a premeditated plan to avoid arrest and prosecution. All of the highly charged arguments that we have recited would not have been presented to the jury. Both the guilt and sentencing stages would necessarily have had an entirely different focus and character.

*Mitchell*, 262 F.3d at 1065. In fact, the Tenth Circuit opinion appears to accept at face value Mitchell's story that he "merely" masturbated and then ejaculated on Scott's bloodied and battered nude body. *See id.* at 1063 (referring to what sentence jury would have given "had it known Mr. Mitchell did not rape or sodomize the victim"); *id.* at 1063–65. This Court strongly disagrees with the Tenth Circuit's apparent expectation that Mitchell's resentencing should have been somehow sanitized of any suggestion that he committed a sexual crime against Scott, or any argument that he killed her in order to avoid being arrested or prosecuted for such a crime.

¶ 32 Even Mitchell does not allege that the State's actions in the handling of his case are responsible for the fact that Scott was found nude, or the fact that his semen was found in her pubic hair (and on a sheet in which her body was wrapped), or the bruising on various parts of her body. The wrongs committed by the State in the prosecution of Mitchell's case do *not* entitle him to a windfall regarding the actual state of the evidence, nor should the State be prohibited from arguing the legally permissible implications of this evidence.[82] In particular, this Court finds that the evidence at the crime scene is sufficient for the State to argue that Mitchell attempted to rape Scott, and that he killed her in order to avoid arrest or prosecution for the crime of attempted rape.

 ¶ 33 In Proposition III, Mitchell challenges the sufficiency of the evidence presented during his resentencing to support the jury's finding of the avoid arrest aggravator. In evaluating such a sufficiency challenge, we view the evidence in the light most favorable to the State, to determine whether any rational trier of fact could have found the aggravator beyond a reasonable doubt.[83] This Court has already addressed the sufficiency of the evidence to support the State's use of rape as a predicate crime (finding the evidence insufficient) and also addressed the potential evidentiary basis for relying upon crimes such as attempted rape or armed robbery as the predicate crime.

¶ 34 Yet Mitchell makes a further claim in Proposition III, based upon our decision in *Williams v. State*.[84] Mitchell claims that regardless of what type of sex crime he may have committed against Scott, this crime was not truly "separate" from the murder.

Hence he argues that the avoid arrest aggravator must be vacated and that it cannot be established in this case. In *Williams*, this Court struck down the avoid arrest aggravator, based upon our prior decision in *Barnett v. State*,[85] finding that the murder of the female victim in *Williams* was not sufficiently "separate" from the attempted rape alleged as the predicate crime.

The facts in the present case fit the pattern of *Barnett*. The only evidence presented of the attempted rape was Appellant's statement to his psychiatrist that he intended to rape Hand, but when he pulled out the knife she tried to get away and screamed for her roommate. He further said he stabbed her one time intending only to silence her. Under this evidence, the attempted rape was not separate and distinct from the murder itself, but rather was part of a continuing transaction which culminated in the death of the victim.[86]

Thus the attempted rape could not be used as the predicate crime for the avoid arrest aggravator in that case; and the aggravator had to be struck down.[87]

¶ 35 The current case is distinguishable from *Williams*.[88] The evidence of an attempted rape in Mitchell's case is more substantial and also more separable from the actual murder. The victim in *Williams* was fully clothed, and the evidence in that case suggests that the defendant's plan to rape her was abandoned almost immediately after the encounter began—when the victim screamed for her roommate and attempted to escape.[89] In Mitchell's case, the condition of Scott's nude body, including the finding of Mitchell's semen in her pubic hair, strongly suggests that this defendant's plan had pro-

---

82. Again, this Court concludes that in the current case, a completed "rape" is not a legally permissible inference that the State can argue.

83. *See DeRosa v. State*, 2004 OK CR 19, ¶ 85, 89 P.3d 1124, 1153, *cert. denied*, 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005).

84. 2001 OK CR 9, 22 P.3d 702.

85. 1993 OK CR 26, 853 P.2d 226 (per curiam). In *Barnett*, we concluded that where a "protracted assault and battery was the ultimate cause of the victim's death," this assault and battery could

not serve as the predicate crime for the avoid arrest aggravator. *Id.* at ¶ 30, 853 P.2d at 234.

86. 2001 OK CR 9, ¶ 85, 22 P.3d at 723.

87. *Id.*

88. It is also distinguishable from *Barnett*, which Mitchell does not specifically address.

89. *See Williams*, 2001 OK CR 9, ¶¶ 2–8, 22 P.3d at 708–09. Attempted rape was not charged as a separate offense.

gressed much further. In addition, the fact that the fatal stabbing in *Williams* may have been part of the defendant's attempt to rape the victim (by subduing her) suggests that any attempted rape in that case was more intermingled with the murder—whereas Mitchell's actions in stripping Scott, leaving bruises on her hips, and leaving his semen on her body were totally separate from and prior to the violent blows from the coat tree that ultimately killed her.[90]

¶ 36 Although the issue is a close one, we conclude that the evidence in the current case could be sufficient to establish that the crime of attempted rape (or other comparable sex crime) was sufficiently separate and distinct from Scott's murder, so as to allow the State to pursue the avoid arrest aggravator in a further resentencing. In addition, the evidence in this case established that Scott knew who Mitchell was and that Mitchell made no attempt to disguise or hide his appearance at the time he attacked Scott. Hence Mitchell would have known that Scott could identify him if she survived, which we have previously recognized as a factor in establishing the avoid arrest aggravator.[91]

¶ 37 For the reasons stated in Propositions I and II, the avoid arrest aggravating circumstance found by the jury in Mitchell's resentencing must be struck down. As explained herein, however, the State shall not be precluded from re-pursuing this aggravator in any future resentencing, so long as it abides by the limitations and restrictions articulated by this Court in doing so.

¶ 38 In Proposition IV, Mitchell challenges the trial court's removal of six prospective jurors based upon their reservations about the death penalty, arguing that it was not adequately established that these jurors would not follow the law.[92] Each of these prospective jurors was removed *sua sponte* by the court, over defense objection and without allowing defense counsel any opportunity to attempt to rehabilitate them through further voir dire questioning. Mitchell argues that these removals violated *Witherspoon v. Illinois*.[93] Mitchell also argues that the trial court abused its discretion, by denying him a chance to further question the six excused jurors.

¶ 39 This Court has repeatedly recognized that the standard for capital juror acceptability in Oklahoma is whether, in a case where the law and facts make a defendant eligible for the death penalty, each juror will be willing to *consider* each of the three authorized punishments: the death penalty, life

90. See *Myers v. State*, 2000 OK CR 25, ¶¶ 68–69, 17 P.3d 1021, 1036 (rape of victim sufficiently separate from murder to serve as avoid-arrest predicate crime where "[t]he cause of death [asphyxiation] ... was separate from and not a direct result of the rape"); *Mollett v. State*, 1997 OK CR 28, ¶ 51, 939 P.2d 1, 13 (rape sufficiently separate to serve as predicate crime where "[t]he evidence demonstrates Appellant raped the victim then strangled and drowned her"); *see also Lott v. State*, 2004 OK CR 27, ¶ 118, 98 P.3d 318, 348 (rapes of victims sufficiently separate to serve as predicate crimes, where "victims' deaths were not the result of the rape," and crime scene evidence "supports the inference Appellant sat on the victims after the completion of the rape and smothered them"), *cert. denied*, 544 U.S. 950, 125 S.Ct. 1699, 161 L.Ed.2d 528 (2005).

91. *See, e.g.*, *Myers*, 2000 OK CR 25, ¶ 69, 17 P.3d at 1036; *Mollett*, 1997 OK CR 28, ¶ 50, 939 P.2d at 13; *see also Lott*, 2004 OK CR 27, ¶ 116, 98 P.3d 318, 348.

92. The challenged removals involve prospective jurors M.M., K.T., Z.S., B.K., A.A., and T.P. Although Mitchell asserts that some of these excused jurors were minorities, he does not raise any race-based (or *Batson*) claim. Hence we do not address this issue. Note: this Court will refer to prospective jurors by their initials, out of respect for their interest in maintaining their privacy.

93. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon*, the Supreme Court held that it violates due process to exclude an otherwise eligible prospective juror based solely upon that juror's opposition to the death penalty. *Id.* at 522–23, 88 S.Ct. at 1776–77. The Court noted that "[t]he most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law...." *Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified that the proper standard for assessing whether a prospective juror can be legitimately excluded, based upon opposition to the death penalty, is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).

imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole).[94] Thus we have repeatedly held that willingness to "consider" the death penalty is all that can legally be required of a juror with moral reservations about this penalty: "[T]he only legitimate concern is whether each jury member is willing to consider imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment."[95] This standard does not require that a juror be willing to state that he or she can think of some situation in which he or she will actually vote to impose or recommend a death sentence.[96]

¶ 40 Prospective Juror M.M. was the first juror to be questioned by the trial court regarding willingness to consider all three possible punishments for first-degree murder. This questioning was as follows:

THE COURT: ... Mr. [M.M.], can you consider all of the legal punishments, death, imprisonment for life without parole, or imprisonment for life, and impose the one warranted by the law and by the evidence?

PROSPECTIVE JUROR M.M.: Third one.

THE COURT: The third one what?

PROSPECTIVE JUROR M.M.: Imprisonment for life, the third one.

THE COURT: Okay. And maybe, Mr. [M.M.], I've not explained myself very well. Let me explain again.

There are three possible punishments in this case. The state is seeking the death penalty, but there are three possible legal punishments: Death, life without the possibility of parole, and life with the possibility of parole. Okay? What I want to know— and each of you jurors I want you to be thinking about as I talk to Mr. [M.M.]

---

**94.** *See, e.g., Banks v. State,* 1985 OK CR 60, ¶ 10, 701 P.2d 418, 422 ("[T]he only legitimate concern is whether each jury member will consider the imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment."); *Duvall v. State,* 1991 OK CR 64, ¶ 24, 825 P.2d 621, 630 ("A venireperson is only required to be willing to consider all the penalties provided by law and that he not be irrevocably committed before the trial has begun.") (citing *Banks* ); *Mayes v. State,* 1994 OK CR 44, ¶ 10, 887 P.2d 1288, 1297 ("The only legitimate concern being whether each jury member will consider the imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment.") (citing *Duvall*). Under our Uniform Jury Instructions, the trial court is instructed to ask each prospective capital juror the following question: "If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments—death, imprisonment for life without parole, or imprisonment for life—and impose the one warranted by the law and evidence?". *See* OUJI–CR 2d (Supp.2000 & 2005) 1–5, Question 12, Alternate 2 (for death penalty cases).

**95.** *Cudjo v. State,* 1996 OK CR 43, ¶ 10, 925 P.2d 895, 898 (citing *Mayes* ); *Lewis v. State,* 1998 OK CR 24, ¶ 8, 970 P.2d 1158, 1164 (quoting *Cudjo* ).

**96.** Hence this Court has repeatedly held that various versions of the following question are *not* an appropriate standard for determining a capital juror's eligibility: "In a case where the law and the evidence warrant, could you without doing violence to your conscience 'agree to a

verdict imposing'/'recommend'/'vote for' the death penalty." *See, e.g., Cudjo,* 1996 OK CR 43, ¶¶ 8–12, 925 P.2d at 898–99 (reversing death sentence where voir dire limited to this improper question); *Mayes,* 1994 OK CR 44, ¶¶ 9–13, 887 P.2d at 1297–98 (question improper, but no reversal where excluded jurors unequivocal that they could not consider death penalty and defendant failed to object to removals); *see also Lewis,* 1998 OK CR 24, ¶ 8, 970 P.2d at 1164 (question improper); *Banks,* 1985 OK CR 60, ¶¶ 9–10, 10, 701 P.2d at 422 (question improper).

We note that the current version of our uniform instruction reflects this appropriate emphasis on a juror's willingness to "consider" imposition of the death penalty (or other penalty to which the juror objects), rather than the juror's willingness to assert that there exist some facts or circumstances under which he or she would actually "impose" the death penalty (or other penalty to which the juror objects). *See* OUJI–CR 2d (Supp.2005) 1–5, Question 12, Alternate 2 (for prospective juror with reservations about death penalty) ("If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the penalty of death so strong that regardless of the law, the facts and circumstances of the case, you would not *consider* the imposition of the penalty of death?") (emphasis added). The prior version of this uniform instruction, which was used in Mitchell's resentencing, is quoted *infra* in note 100.

about it—is whether you can give honest, thoughtful consideration to all three possible punishments and impose the one that you believe is warranted by the law and by the evidence. And when I say consideration, I'm not paying lip service to it.

It's kind of like I hate Brussels sprouts and I will never ever, ever eat them. Okay? But when I go down the cafeteria line and I look at Brussels sprouts, I might look at them and go, no, and then I go on. Some people think that's considering them. That's not what I'm talking about here. Because I know in my heart of hearts that I will never eat Brussels sprouts. Okay? It's a more simplistic explanation, but that's what I want every one of you to think about.[97] Will you give honest, thoughtful consideration to all three punishments and impose the one that you believe is warranted by the law and the evidence?

Can you do that Mr. [M.M.]?

PROSPECTIVE JUROR M.M.: Yes.

THE COURT: You can consider all three punishments?

PROSPECTIVE JUROR M.M.: No. Life without.

THE COURT: Can you consider all three punishments, death, life without the possibility of parole, or life imprisonment?

PROSPECTIVE JUROR M.M.: Yes.

THE COURT: Mr. [M.M.], I'm not sure if we're not communicating, I'm not—you say yes and then you say no. Do you have a problem?

PROSPECTIVE JUROR M.M.: No, I don't have a problem.

THE COURT: Okay. You can consider all three punishments?

PROSPECTIVE JUROR M.M.: No, just the second one.

THE COURT: Okay. You can consider life without parole or life?

PROSPECTIVE JUROR M.M.: Yes.

THE COURT: Can you consider the death penalty?

PROSPECTIVE JUROR M.M.: No.

THE COURT: Okay. Are there any circumstances that you can envision where you could consider the death penalty?

PROSPECTIVE JUROR M.M.: No.

THE COURT: All right. Mr. [M.M.], I'm going to excuse you for cause....

¶ 41 Defense counsel immediately approached the bench and requested an opportunity to voir dire this juror, noting that M.M. twice stated that he could consider all three punishments and also gave inconsistent answers. The trial court responded: "He did originally give inconsistent answers. I, frankly, don't know if he didn't understand my question or didn't much want to talk to me. He had probably one of the worst attitudes of any juror I've seen in here...." The court ruled, however, that because M.M. stated that he would not consider the death penalty and that he would not change his mind about it, further voir dire was not required.[98] Defense counsel continued to press for further voir dire, suggesting that M.M. may not have understood the questioning, but the court denied these requests and struck M.M. over defense objection.[99]

97. No challenge is raised to the trial court's Brussels sprouts analogy. Nevertheless, as in the context of the "reasonable doubt" standard, we caution against attempts to define or further explain the meaning of "consider" in this context. The word "consider" has a commonly understood meaning; and even good-faith attempts to clarify its significance in this context invariably run the risk of shading its meaning in a way that is misleading or erroneous.

98. Although the trial court noted the bad attitude that this particular juror apparently exhibited, the court's stated reason for striking him was his view on the death penalty, not his attitude.

99. The court stated: "I think he did [understand the questions]. I made them in as simplest

words as I could. I didn't use the word unequivocal, for example, fearing he might not understand it. So I used very simple words and I think he understood.... I don't know. I made my ruling." During later questioning, however, the trial court repeatedly asked jurors who expressed reservations about the death penalty if they were "unequivocal" in their beliefs, sometimes adding an explanatory phrase about whether the juror might change his/her mind and sometimes not. This Court agrees with the trial court's initial approach of avoiding the word "unequivocal" when questioning prospective jurors. Although this word is used by courts to evaluate the strength of a juror's beliefs in this arena, the term could confuse many jurors.

¶ 42 When Prospective Juror T.P. was asked whether she could consider all three punishments, the following exchange occurred:

PROSPECTIVE JUROR T.P.: It would be hard for me to choose the death penalty. I could do everything up to that, and I would do that. I've seen situations where I felt like it was warranted, but was so glad I wasn't making that decision.

THE COURT: Okay. And I would expect that it will be a difficult decision for everybody as to whatever decision they ultimately make. The question that I have for you, ma'am, is can you give honest, thoughtful consideration in the manner that I have described, not just pay lip service to it, but honest, thoughtful consideration to that punishment, as well as the other two punishments, and impose the sentence of death if you believed it was appropriate?

PROSPECTIVE JUROR T.P.: I don't think I could.

THE COURT: You could not do that?

PROSPECTIVE JUROR T.P.: I don't think so.

THE COURT: Okay. And you have said you could—I think you said to me earlier, I can envision where that would be appropriate but I'm glad I didn't have to decide that. Can you envision any set of circumstances where you, along with other jurors, would impose a sentence of death?

PROSPECTIVE JUROR T.P.: Yes, I can.

THE COURT: Okay. Is your decision about the death penalty—let me ask you this: So you're saying you can envision a scenario where it would be.

PROSPECTIVE JUROR T.P.: I can presume him innocent.

THE COURT: Sure.

PROSPECTIVE JUROR T.P.: And decide, yes, he was guilty of, and be in a jury room where everybody felt like he should be put to death and I could agree on that.

THE COURT: Okay. And can you do that in this case?

PROSPECTIVE JUROR T.P.: Yes.

THE COURT: Okay. Then I misunderstood you before. I'm sorry.

PROSPECTIVE JUROR T.P.: Do you have to want to do it?

THE COURT: No. What you have to— what you have to be able to do is to truly— I mean, what you have to be able to do right now is tell me, I honestly believe in all fairness that I can consider all three punishments and I can impose death if I believe it's appropriate, I can impose life without the possibility of parole if I believe it's appropriate ..., and I can impose life if I believe that's the appropriate sentence. Can you fairly [sic] and tell me those three things? You can do that?

PROSPECTIVE JUROR T.P.: Yes.

THE COURT: Okay. You feel confident of that?

PROSPECTIVE JUROR T.P.: No, I don't.

THE COURT: Okay.

PROSPECTIVE JUROR T.P.: I'm sorry. I'm sorry.

THE COURT: That's okay. I'll come back to you. I want you to think about it a little more. Okay?

¶ 43 After questioning other jurors, the trial court returned to Prospective Juror T.P. This time their exchange was as follows:

THE COURT: I've given you a little bit of time to think about it. Can you consider all three of the legal punishments, death, life without the possibility of parole, and life, and impose the one that you believe is warranted by the law and the evidence?

PROSPECTIVE JUROR T.P.: Your Honor, I appreciate the time. I've always been against the death penalty and do not feel like I can consider that.

THE COURT: Okay. Let me ask you this: Are you saying that if under the evidence, facts, and circumstances of this case the law would permit you to consider a sentence of death that your reservations about the penalty of death are so strong that regardless of the law, the facts, and circumstances of the case you would not impose the punishment of death? [100]

100. This question was in accord with the uni- form criminal instruction in effect at the time of

PROSPECTIVE JUROR T.P.: That's right, I wouldn't.

THE COURT: Okay. And would you change your mind or are you unequivocal?

PROSPECTIVE JUROR T.P.: I'm unequivocal.

The trial court then struck T.P. for cause, over defense objection, and refused to allow defense counsel any opportunity to question her.[101]

¶ 44 Prospective Jurors M.M. and T.P. certainly fit the standard of giving equivocal answers regarding their willingness to consider the death penalty.[102] The transcript reflects that the trial court had difficulty determining the eligibility of these jurors to serve. Yet the trial court failed to ask M.M. the appropriate clarifying question, under our uniform jury instructions, about his willingness to consider the death penalty despite his objection to it.[103] Because the last-recorded answers of both M.M. and T.P. indicated that they were not able to consider the death penalty, this Court cannot conclude that the trial court erred when it struck them for cause. However, because these jurors had also indicated (more than once) that they could, in fact, consider the death penalty, we conclude that the trial court abused its discretion in not allowing defense counsel an opportunity to further question them.[104]

¶ 45 This Court is particularly concerned by the inconsistent approach that the trial court adopted toward jurors who indicated a predisposition toward a particular penalty. On each of the six occasions when the trial court encountered a juror with reservations about the death penalty, the court alone questioned the juror, and then struck him or her without even waiting for a request from the State. The court also denied Mitchell any opportunity to voir dire these six jurors, despite the strenuous objections of his coun-

---

Mitchell's resentencing. *See* OUJI–CR 2d (Supp. 2000) 1–5, Question 12, Alternate 2 (for prospective juror with reservations about death penalty) ("If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the penalty of death so strong that regardless of the law, the facts and circumstances of the case, you would not impose the penalty of death?").

101. When defense counsel pointed out that T.P. had earlier stated that she could "envision a circumstance where she could impose the death penalty" and also that she could consider it if she were a juror in the case, the trial court responded: "No. That's not how I recall it. She was having difficulty about trying to decide whether or not she can impose the death. She said she could not do it but she can envision a set of circumstances where it would be appropriate, but that she could not do it as I recall what she said." In fact, the transcript reflects that T.P. did indicate, at least three times, that she herself could consider and even impose the death penalty.

102. This Court finds that it can resolve Mitchell's claim on appeal without addressing the exclusion of the other four jurors, whose answers were not as equivocal as those of M.M. and T.P. We note (as did the trial court) that whether M.M. actually had misgivings about the death penalty, or was simply being difficult, is unclear. The transcript suggests, however, that T.P. was quite sincere in her answers, though she struggled to determine her own view.

103. *See* notes 96 and 100 *supra* (quoting the 2005 and 2000 versions of OUJI–CR 2d 1–5, Question 12, Alternate 2 (for prospective juror with reservations about death penalty)). M.M. was not asked either version of this question.

104. *See Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (reversing death sentence where defendant not allowed adequate voir dire to determine capital juror eligibility). In *Coleman v. State,* 1983 OK CR 138, 670 P.2d 596, this Court considered the exclusion of a juror who twice stated that he could not agree to a death penalty verdict without "doing violence to [his] conscience." The trial court in that case, however, permitted further voir dire by defense counsel, which established that despite the juror's conscientious scruples against capital punishment, he would follow the court's instructions and could assess the death penalty. This Court found that this further questioning established the juror's eligibility to serve, and reversed the defendant's capital murder conviction based upon the improper removal of that juror. *Id.* at ¶¶ 14–19, 670 P.2d at 598–99. Mitchell's counsel was not given a parallel opportunity to rehabilitate the struck jurors in his case, which might likewise have established that one or more of them was, in fact, eligible to serve. *Cf. Cudjo,* 1996 OK CR 43, ¶¶ 8–12, 925 P.2d at 898–99 (vacating death sentence where inadequate voir dire prevented this Court from determining whether two jurors removed for reservations about death penalty were, in fact, ineligible to serve).

sel. Yet when later prospective jurors expressed an unwillingness to consider either or both of the life sentence options, the trial court's approach was rather different.

¶ 46 During defense counsel's voir dire, Prospective Juror S.O. repeatedly stated that he believed that the death penalty was the *only* appropriate penalty for someone who takes the life of another person.[105] When defense counsel asked that S.O. be struck for cause, the trial court—though not challenging counsel's characterization of S.O. as "unequivocal"—announced, "I'm just going to ask him a couple questions," in order to be "certain." [106] When the court later encoun-

tered another juror expressing a parallel view, the court seemed to struggle to avoid striking the juror, despite his clear intent to consider only the death penalty.[107] Furthermore, when two other jurors indicated that they would not be able to consider a life sentence (with parole),[108] after hearing that Mitchell's case involved allegations of rape/sexual assault, the trial court labored mightily to persuade the jurors that they should not exclude themselves too hastily, since the facts of the case were not yet established.[109]

¶ 47 The voir dire questioning in Mitchell's case, in which the only issue before the jury

105. *See Morgan*, 504 U.S. at 729, 112 S.Ct. at 2229–30 (juror who will "automatically" vote for death penalty not eligible to serve on capital jury).

106. The court then struck S.O. when he remained steadfast in his commitment to consider only the death penalty for intentional murder.

107. The Court's exchange with Prospective Juror B.W. was as follows:

THE COURT: Okay. There are three possible punishments in this case, death, imprisonment for life without parole, or imprisonment for life. Can you consider, Mr. [B.W.], all three of these punishments and impose the one that you believe is warranted by the law and the evidence?
PROSPECTIVE JUROR B.W.: No.
THE COURT: Okay. Which—what is your problem?
PROSPECTIVE JUROR B.W.: I believe if you take someone's life, then your life should be taken.
THE COURT: Okay. So are you telling me that you could not consider a sentence of life?
PROSPECTIVE JUROR B.W.: I could not consider being on parole or sentenced to life in jail, I could not consider those two.
THE COURT: Okay. The only punishment that you would consider is death, is that what you're saying to me?
PROSPECTIVE JUROR B.W.: Yes, yes.
THE COURT: Okay. And are you telling me that under the evidence that you heard in this case and the law that I give you, that you could not consider a sentence of life or life without the possibility of parole, that your reservations about those two punishments are so strong that you could not consider giving them?
PROSPECTIVE JUROR B.W.: Yes.
The trial court then struck B.W. for cause, without objection from either side.

108. *See Salazar v. State*, 1996 OK CR 25, ¶¶ 20–29, 919 P.2d 1120, 1127–29 (prospective juror who will not consider option of life sentence with parole not eligible to serve on capital jury).

109. On the second day of voir dire questioning, Prospective Juror E.M. raised her hand, and the following colloquy occurred:

PROSPECTIVE JUROR E.M.: I know that I answered that I would consider all three.
THE COURT: Yes, ma'am.
PROSPECTIVE JUROR E.M.: But in hearing so much of what has happened and what's gone on, there's no way that I could consider life with the possibility of parole on what I've heard.
DEFENSE COUNSEL: Okay.
THE COURT: Ms. E.M., let me ask you just a couple of questions. I can tell that you're a little bit upset about this, and that's okay. But let's just talk about this for a minute. Okay?
 You haven't heard any evidence yet. And—
PROSPECTIVE JUROR E.M.: No, but just the circumstances of what the murder was, the brutality of it. I have a daughter. I can relate to that. And there's no way that I would let a murderer that has raped and killed someone have the possibility of parole. I wouldn't necessarily say death or—I could go with death and I could go with life imprisonment, but I cannot go with life with the possibility of parole. I thought I could, but I can't consider that.
THE COURT: Okay. I'm trying to think of how to frame my question. Just give me a second. Let me think.
 The things that you have mentioned are factors that you will ultimately be able to consider if there is evidence produced in court as to determine punishment. All right?
PROSPECTIVE JUROR E.M.: Uh-huh
THE COURT: But those have yet to come into evidence before you. Are you following me? I recognize what the lawyers have said and what they have discussed here, but ultimately it may be your decision, that based on certain factors that you hear in the evidence, I believe—I suspect it will be everybody, I believe this is appropriate punishment. All right? But at this point in time, you have not heard that in the form of evidence.

was his sentence for the first-degree murder of Elaine Scott, lasted more than two days. This Court notes that the trial court's unwillingness to provide Mitchell any opportunity to voir dire jurors who expressed reservations about the death penalty—even jurors whose answers were unquestionably equivocal—stands in sharp contrast to the court's willingness to allow and even assist in protracted attempts to rehabilitate jurors who expressed an unwillingness to consider one or both of the life sentences at issue. This Court also notes that the necessity of removing the two jurors who would not consider a regular life sentence (after they heard the prosecutor's portrayal of Mitchell's murder and rape/sexual assault of Scott), appears to be the direct result of the trial court's failure to place any significant limitations on the State's voir dire "questioning," which repeatedly covers multiple transcript pages without the asking of a legitimate question, and often reads more like an opening statement or even a closing argument.[110]

¶ 48 This Court finds that the trial court's willingness to allow almost totally unconstrained questioning/argument from the State during voir dire made the court's refusal to allow any attempt by Mitchell to rehabilitate the challenged jurors even more unfair. The treatment of the two parties during voir dire was far from even-handed, and this Court will consider this disparity in its determination of how to remedy the other errors found herein.

¶ 49 In Proposition V, Mitchell challenges various references to rape and sexual assault made by the prosecutor during voir

> PROSPECTIVE JUROR E.M.: Okay.
> THE COURT: What you have to be able to do at this point is without knowing what the evidence is going to be, other than he's guilty of murder, okay, and we know that that's been defined for you as the intentional taking of a human life, is can you consider all of those punishments? What you have referred to, and this is what concerns me and this is the difficulty that we sometimes face in talking about these issues, so more specifically, is that some of these things that you have discussed are things that might factor into your ultimate decision as to what you believe the appropriate punishment is. But you've not yet heard the evidence. So it might be fair for you to ultimately reach that conclusion, that based on this evidence that I have heard, I believe these things to have occurred, and following all of the court's instructions on that, this is the conclusion that I reach, these are the proper punishments. What we have to know now is can you look at all three punishments for the crime of Murder in the First Degree and ultimately decide what is appropriate based on what you hear in this courtroom?
> PROSPECTIVE JUROR E.M.: I can't look at life with parole.
> THE COURT: Despite the fact that you have not heard that—heard that evidence now.
> PROSPECTIVE JUROR E.M.: That's correct.
> THE COURT: Okay.

At this point—and without any equivocation by the juror—the trial court offered the State an opportunity to further question E.M. The prosecutor's attempt to rehabilitate E.M. covers an additional eight transcript pages—in which he suggest that perhaps the State will not be able to prove any sexual assault after all—leaving the juror thoroughly confused. Nevertheless, after defense counsel gave her a break from questioning to further ponder the issue, E.M. steadfastly maintained that she would not consider sentencing Mitchell to life imprisonment—that she would "never consider that"—and was ultimately struck for cause, without objection from the State.

On the third day of voir dire, when Prospective Juror J.W. indicated that he could not consider life imprisonment with the possibility of parole, a parallel exchange began with him:

> THE COURT: Are you telling me that under any set of facts or circumstances that you could give not give life with the possibility of parole for Murder in the First Degree?
> PROSPECTIVE JUROR J.W.: Not in the sense he took somebody's life. Not knowing the facts, when I don't have them, but since he took somebody's life and rape involved.
> THE COURT: We're not talking about that. Number one, that's not been established by any evidence. Okay? What I need to know now before you know any of the facts of this case, and this is the danger that we talked about yesterday of the lawyers talking about a possible sexual assault—they've got to prove it. You may decide they didn't prove it. . . .

After about another transcript page of the trial court attempting to rehabilitate J.W., the lead prosecutor, apparently sensing the futility of this effort, interrupted: "Your Honor, we have been through this exhaustively with Ms. [E.M.] and with witnesses in front of him—or jurors in front of him. He's heard this explained. If we're getting this much equivocation, I don't believe this is a juror who could be fair." The court then excused J.W.

110. During an objection to the prosecutor's voir dire, defense counsel noted that it "[j]ust seems like he's making more of an opening statement than voir dire." The court responded, "I don't believe that he is. That's overruled."

dire, asserting that the remarks predisposed jurors to the idea that he raped Scott. Mitchell cites no authority in support of this particular claim; and this Court has already addressed the propriety of the State's references to rape and sexual assault within Proposition I. Hence we do not further address this claim.

¶ 50 In Proposition VI, Mitchell challenges the admission into evidence of numerous graphic photographs of the victim's body, both at the crime scene and in connection with the autopsy, as well as a videotape of the crime scene showing the body. Defense counsel vigorously objected to the photographs—both to individual photographs and to the overall impact of so many disturbing pictures—arguing that they were cumulative and that their probative content was substantially outweighed by their prejudicial effect. Mitchell also vigorously objected to the crime scene videotape, arguing that it was cumulative to all of the other evidence and unduly prejudicial.

¶ 51 Among the numerous crime scene photographs admitted into evidence, twenty-two different pictures show all or a portion of the victim's body.[111] In addition, fourteen different autopsy photographs were admitted, further highlighting the victim's injuries.[112] The crime scene and autopsy photographs were introduced into evidence and published to the jury during the testimony of Lieutenant Vance Allen. These same photographs were then used and displayed extensively a second time, during the "crime scene reconstruction" testimony of Tom Bevel.[113] The prosecutor acknowledged at trial that only a few of these photographs were admitted during Mitchell's original trial.[114]

¶ 52 During Bevel's testimony the jury was also shown a silent videotape of the crime scene, which repeatedly panned over the victim's body and even showed significant insect activity on and around the body.[115] In addition, and prior to the testimony of both Allen and Bevel, the medical examiner (Dr. Larry Balding) testified in great detail about the nature and extent of Scott's injuries; and his diagrams of these injuries were admitted into evidence.

■ ¶ 53 This Court is very troubled by the extent of graphic and potentially inflammatory evidence that was provided to Mitchell's resentencing jury, which went so far beyond the evidence used in his original capital trial. Although a substantial portion of this evidence was certainly admissible, particularly insofar as it was relevant to the "heinous, atrocious, or cruel" and "continuing threat" aggravating circumstances, we find that the trial court abused its discretion by failing to properly constrain the State in its presentation of this evidence, much of which was cumulative.[116] We further find that the trial court's failure to do so supports our determination, in Proposition XVI, that Mitchell's death sentence must be overturned. Although we decline to determine precisely which exhibits should have been excluded, we trust that any further proceed-

---

111. The crime scene pictures that show all or a portion of the victim's body are State Exhibits 61–64, 67, 121, 122A, 125, 126, 138–140, and 146–155.

112. The autopsy photographs are State Exhibits 77, 158–61, 161–A, 162, 163, 168, 169, 171–174.

113. Bevel's testimony is further addressed *infra* in Proposition VIII.

114. The prosecutor informed the court that exhibits numbered above "81" were not admitted in Mitchell's original trial.

115. Neither Tom Bevel nor the crime scene videotape played any role in Mitchell's original trial. Nevertheless, the trial court admitted the videotape, stating that it "put things in perspective" and that the State was "entitled to corroborate every witness who has testified and to corroborate the expert witness on the order and method of the killing." Prior to the videotape the State had already presented extensive testimony describing the Pilot Center and the crime scene, as well as a diagram and numerous pictures of the Center and the crime scene.

116. *See Lockett v. State*, 2002 OK CR 30, ¶ 19, 53 P.3d 418, 424 (test for admissibility of photographs of homicide victim is whether probative value substantially outweighed by danger of unfair prejudice, and review for abuse of discretion); *see also Cannon v. State*, 1998 OK CR 28, ¶ 52, 961 P.2d 838, 852 (crime scene videotapes reviewed under same standard as photographs and "caution prosecutors to select their visual exhibits carefully and to refrain from admission of repetitive photographs or videotapes").

ings in this case will be conducted with due regard for the limited issues before the resentencing jury and the necessity of avoiding undue prejudice to the defendant.

¶ 54 In Proposition VII, Mitchell raises seven different challenges to evidentiary rulings made by the trial court. We take up these issues in turn. First, Mitchell notes that the trial court allowed the State to read into the record the testimony of two witnesses, Velma Kibbey and Andre Wilson, without first making a determination that these witnesses were unavailable.[117] The State notes that Mitchell did not object on this basis, waiving all but plain error. Mitchell did object, however, that the evidence was irrelevant—a point that the State now apparently concedes.[118] This Court agrees that the testimony of these witnesses was irrelevant to the issues at stake in the resentencing, since it related only to the question of whether Mitchell killed Scott. Nevertheless, we find no plain error in the court's failure to rule on the availability of these witnesses and

no prejudice from the unnecessary presentation of their testimony.[119]

¶ 55 Second, Mitchell challenges the trial court's refusal to allow him to present mitigating evidence, in the form of two letters, a poem, and a birthday card, all sent by Mitchell to his younger brother, Michael Postoak.[120] In his transcribed testimony, Postoak described his close relationship with his older brother, even though Mitchell had been imprisoned, which included receiving letters, birthday cards and phone calls from Mitchell.[121] Although the State raised no objection to Postoak's recorded testimony, it raised a hearsay objection to the admission of the actual written materials, which the trial court sustained.[122]

¶ 56 We addressed the admissibility of similar letters from a capital defendant in *Medlock v. State.*[123] We concluded that under *Lockett v. Ohio*[124] and *Eddings v. Oklahoma,*[125] such letters "are relevant mitigating evidence that should have been admitted." [126] The State offers no response to the authori-

117. *See Littlejohn v. State,* 2004 OK CR 6, ¶ 27, 85 P.3d 287, 297, *cert. denied,* 543 U.S. 947, 125 S.Ct. 358, 160 L.Ed.2d 261 (2004). The State essentially reenacted the testimony, with a prosecutor and a police lieutenant playing Kibbey and Wilson, respectively.

118. Velma Kibbey, who lived across the street from the Pilot Center, testified that on the afternoon of the murder, she saw someone who looked like Mitchell drive off in Scott's car. Andre Wilson testified that on that same afternoon, he saw Mitchell walking away from Scott's abandoned car. The State argues in its brief that the testimony of these witnesses "had no bearing on the aggravating or mitigating evidence presented in this case."

119. We note that this testimony was part of a pattern of the State being allowed to "reconvict" Mitchell, leading to an unnecessarily long proceeding and potentially confusing jurors, who had been repeatedly told that that they must accept, as a given, that Mitchell murdered Scott.

120. The testimony of Postoak was videotaped and transcribed three months prior to Mitchell's resentencing, since Postoak was in the Army (Private First Class) and stationed at Fort Campbell, Kentucky, having just returned from Afghanistan. Because Postoak was unavailable at the time of Mitchell's resentencing—and the videotape "didn't turn out"—his transcribed testimony was read to the jury. Copies of the materials proffered by Mitchell appear in the record as

Court's Exhibits 1–4, attached to the transcript of Postoak's testimony.

121. Postoak testified that the proffered materials were not the only ones he received from Mitchell, that he "can't keep track of all of them," but just ones that he had saved, with special meaning.

122. The court agreed with the State's argument that it would be "unfair" to admit Mitchell's letters to his brother, unless the State could cross-examine Mitchell about them: "[Y]ou're basically wanting the jury, as I understand it, not only to see the effect that it had on his brother, but to also say whatever, look, [Mitchell] encouraged [Postoak] to go to church, so he must be a God-fearing man, or whatever you might say. I think it is unfair to allow that to go before a jury without the State being allowed to cross-examine the truthfulness of these letters." The State stipulated to the authenticity of the materials sent by Mitchell and noted that it would not challenge their admissibility if Mitchell chose to testify during the resentencing.

123. 1994 OK CR 65, ¶¶ 42–43, 887 P.2d 1333, 1346.

124. 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

125. 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

126. 1994 OK CR 65, ¶ 43, 887 P.2d at 1346.

ties cited by Mitchell. We likewise find no reasonable basis for the trial court's decision. The constitutional mandate to allow a capital defendant broad scope in the presentation of mitigating character evidence is well established, as is the error in mechanistically applying the rules of evidence to defeat this right.[127]

 ¶ 57 The letters from Mitchell to his younger brother suggest a positive, nurturing, even devout side to his personality, in a way that none of the other evidence presented at his capital resentencing could or did, especially because they present the defendant in his own voice.[128] The potential for such evidence to "humanize" a defendant—particularly a defendant who has committed crimes as horrifying as Mitchell's—is far from insignificant and must not be lightly overlooked. We find the trial court erred in

127. *See Eddings,* 455 U.S. at 110, 102 S.Ct. at 874 ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (quoting *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964–65) (emphasis in originals); *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."); *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) (vacating death sentence where trial court improperly excluded evidence under hearsay rule); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (reversing death sentence where trial court excluded mitigating evidence of defendant's good behavior while incarcerated); *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369, 380 (1990) ("The Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall.") (emphasis in original).

128. Court's Exhibit I is an undated letter, which states as follows:

Michael,

Well, little bro I really don't know what to tell you about what's going on around there. You're being strong and that's what matters right now.

You should use what you see to make you more motivated about where you want to go in life. You see the bad side of life, now aspire to be better than all of them and to know what you don't want to be in life. You are doing a great job with your grades, you keep it up, okay? I'm proud of you boy always have been and always will be. Keep your eyes on your dreams and goals [?] and don't let *anybody* get you down. It's probably just jealousy, that you're going to do what none of them have done. You just ignore those idiots and do your thing. You watch out for those younger kids and do what you can to help them make it, always remember that momma would be very proud of you.

Michael are you still going to church? If you are pray that God helps you to be strong and for the rest of them pray God changes their hearts for the better. Because through Him *all* things are possible, if you only believe. Ask your pastor to pray with you about this and have faith that He *will* protect you and the other kids and He will bring the others to their knees before Him. You have all the answers you'll ever need in Him, you only have to ask of Him what you will.

Mike, you keep doing what you know is right and you'll never be in the wrong.

I'm proud that you are my little brother and you're turning into a good man. I wish I could have been there to watch your transformation. You be good and keep doing what you're doing. Love you boy.

Your Brother,
Alfred B.

Court's Exhibit 2 is a poem, dated January 28, 1996, titled "Dream Maker." Postoak testified that he asked Mitchell to write him a poem, and this was the one he sent. Court's Exhibit 3 is another letter, dated March 3, 1999. It reads:

Michael,

What's going on dude? nothing much down here, I'm just chillin' as always. I thought I'd drop you a line to see what's going on with and to wish you a Happy Birthday.

I couldn't get a card and my lawyer was on vacation so I couldn't have her send you one, but all the same I love you boy and didn't want you thinking I forgot your Birthday. I hope it's a good one.

Well, since you don't write anymore I don't know how you're doing that much anymore. I hope you're staying out of trouble and remember I'm always here if you need to vibe [?] or something, alright?

You take care and keep it real always with the Almighty. Alright? I love you and miss you lil brotha.

Your brotha,
Alfred B.

Court's Exhibit 4 is an undated birthday card. The card reads: "May God's blessings be extra sweet ... to make your special day complete! Happy Birthday." The handwritten note reads: "Michael, Happy Birthday. I love you little brother. Your Bro, Alfred B." The dates on Exhibits 2 and 3 reveal that they were written while Mitchell was on death row, after this Court affirmed his convictions and death sentence, before any federal habeas relief had been granted.

excluding this evidence. The impact of this error will be addressed within Proposition XVI.

¶ 58 Third, Mitchell challenges the testimony of Detective John Maddox, in which Maddox summarized Mitchell's own testimony from the original trial. Mitchell raised no objection to this testimony during the resentencing; nor does he assert that Maddox's summary was inaccurate. We find no plain error.

¶ 59 Fourth, Mitchell challenges the admission into evidence of State's Exhibit 227, a timeline prepared by Tom Bevel, which summarizes Bevel's testimony about the "probable sequence of events" in the Scott homicide. Mitchell argues that the timeline should not have been admitted as a regular exhibit. The State characterized the timeline as "a demonstrative aid to the jury to help them with Captain Bevel's testimony." Yet the court admitted it as a regular exhibit. Mitchell failed to object on the basis now raised, relying instead on his broader objection to Bevel's testimony.[129] Nevertheless, we find plain error, based on the State's own (accurate) characterization of the exhibit as a "demonstrative aid." [130]

¶ 60 Fifth, Mitchell argues that the trial court should not have compelled defense expert witness, Dr. Manuel Saint Martin, to talk to prosecutors about statements made to him by Mitchell.[131] Prior to trial the State

was given Dr. Saint Martin's report, indicating his opinion that, for a number of reasons (including a near-death medical experience), Mitchell was now "accepting responsibility" for his crime against Scott. The State maintained that it was entitled to probe the basis of this expert opinion, including finding out what Mitchell said about the murder of Scott during both interviews. The trial court agreed and, over strong defense objection, ordered Dr. Saint Martin to meet with prosecutors and answer their questions about what Mitchell told him.[132]

¶ 61 This Court finds that in the specific factual circumstances of this case, the trial court's ruling was correct. Mitchell chose to present the testimony of Dr. Saint Martin, as an appropriate part of his mitigating evidence that he was now accepting responsibility for what he had done to Scott. In so doing, Mitchell waived his Fifth Amendment protection against the compelled production of this information, as well as any attorney-client protection that would have attached to this specific information. Mitchell cannot have it both ways, and the trial court was correct in ordering Dr. Saint Martin to reveal the factual basis of his expert opinion. The cases cited by Mitchell are inapposite.[133]

¶ 62 Sixth, Mitchell argues that the trial court erred in allowing the State to question witness Tom Bevel, over objection, using hypothetical questions based upon in-

---

129. Mitchell's broader challenge to Bevel's testimony is discussed within Proposition VIII.

130. *See Harris v. State*, 2000 OK CR 20, ¶ 18, 13 P.3d 489, 495 (illustrative/demonstrative aids used to explain expert's testimony "should not have been made available for the jury during deliberations as they have no independent evidentiary value").

131. Dr. Saint Martin is a psychiatrist and an attorney. He first met with and evaluated Mitchell in 1997 and then reevaluated him in 2002, in preparation for the resentencing.

132. This investigation revealed that in 1997 Mitchell was still blaming a person named "C–Ray" for the murder, though by 2002 Mitchell had acknowledged that he alone beat and killed Scott. As the State brought out on cross-examination, however, Mitchell did not admit to any type of sexual crime against Scott. Instead, he

told Dr. Saint Martin that he undressed Scott after she was already dead—to make the scene look as if a rape had occurred—and then masturbated and ejaculated on her body. Dr. Saint Martin acknowledged that if, in fact, some type of sexual attack took place before Scott was killed, Mitchell still had not taken responsibility for that.

133. The primary case relied upon by Mitchell is *Traywicks v. State*, 1996 OK CR 54, 927 P.2d 1062. This case involved a very different question, namely, the use of a defendant's silence in an interview with a State mental health expert to impeach the defendant's trial testimony about his mental state during the crime. *Id.* at ¶ 6, 927 P.2d at 1063. Nevertheless, the *Traywicks* opinion discusses various ways that a defendant can waive his Fifth Amendment protection by the choices he makes in defending/presenting his case. *See id.* at ¶¶ 9–12, 927 P.2d at 1064–65. That is what happened here.

formation obtained from Dr. Saint Martin.[134] Mitchell's challenge relates only to timing, since Bevel testified before Saint Martin. Before allowing the questioning, the trial court confirmed that Mitchell did still plan to present the related testimony from Saint Martin.[135] Hence the trial court did not abuse its discretion in allowing the hypothetical-based questioning of Bevel; and Mitchell was not prejudiced thereby.[136]

¶ 63 Seventh, Mitchell challenges the trial court's decision allowing the State to present the testimony of Dr. Herman Jones, in order to rebut Michell's claim that he no longer poses a continuing threat to society. This Court notes that the resentencing jury rejected the "continuing threat" aggravator. Hence any error in allowing this rebuttal testimony has been rendered moot.[137]

¶ 64 In Proposition VIII, Mitchell challenges the "crime scene reconstruction" testimony of the State's expert witness, Tom Bevel. Mitchell acknowledges that this Court has approved the admissibility of blood spatter analysis (also known as bloodstain pattern analysis) and recognized Bevel as an expert in this field.[138] He argues, however, that the discipline of "crime scene recon-

struction" has not been similarly approved or defined, nor have we previously determined Bevel's expertise in this area. Hence he argues that the trial court erred in failing to conduct a *Daubert* hearing regarding Bevel's testimony.[139] Mitchell further argues that even if crime scene reconstruction is a legitimate discipline and appropriate for expert opinion, Bevel's testimony went beyond the permissible boundaries of expert opinion in this field, and that the trial court failed to fulfill its role as gatekeeper regarding Bevel's expert testimony.

¶ 65 Although our cases have sometimes referred to "crime scene reconstruction," this Court has not defined the parameters of crime scene reconstruction as a discipline appropriate for expert testimony.[140] Using the term loosely, crime scene reconstruction is largely the province of the jury, since it is the jury's role, as the finder of fact, to collectively "reconstruct" what happened at the time a crime was (or was not) committed, and thereby determine the defendant's accountability therefore.[141] It is the role of the jury to take all of the varying types of evidence put before it and, by looking at the totality of this evidence, determine what actually oc-

---

**134.** In particular, the State asked Bevel whether the crime scene was consistent with Scott remaining clothed throughout the attack, and then being undressed after she was already dead.

**135.** And this later testimony was consistent with the hypothetical questions posed to Bevel.

**136.** *See Romano v. State,* 1995 OK CR 74, ¶ 63, 909 P.2d 92, 117.

**137.** Dr. Jones's "rebuttal testimony" covered various matters, including his theory of "successive approximations," under which individuals "admit responsibility only when they feel caged or trapped or there is no obvious way out, so that their stories get closer to the physical evidence over time." We note that Jones specifically stated that he was not in a position to testify regarding whether Mitchell was a "continuing threat": "I can't address the issue of whether Mr. Mitchell was violent or presents a continuing risk at this time, I'm not in a position to be able to do so on the basis of my contacts with him 14 years ago."

**138.** *See Farris v. State,* 1983 OK CR 141, ¶¶ 4–9, 670 P.2d 995, 997–98 (recognizing geometric blood stain interpretation as appropriate for expert testimony and Tom Bevel as expert in field).

**139.** *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**140.** In *Farris,* we described geometric blood stain interpretation as "a method used to reconstruct the scene of the crime." 1983 OK CR 141, ¶ 4, 670 P.2d at 997. In *Slaughter v. State,* 1997 OK CR 78, ¶ 120, 950 P.2d 839, 871, we referred to Bevel as "an expert in crime scene reconstructions," though we did not otherwise discuss or analyze the issue. The Tenth Circuit Court of Appeals has described Bevel as "an expert in geometric blood stain pattern interpretation and crime scene reconstruction." *See Hooks v. Ward,* 184 F.3d 1206, 1211 (10th Cir.1999).

**141.** *See, e.g., Sims v. State,* 1987 OK CR 2, ¶ 19, 731 P.2d 1368, 1371 (photographs relevant "to aid the jury in reconstructing the crime scene"); *Moore v. State,* 1986 OK CR 25, ¶ 5, 714 P.2d 599, 601 ("The photographs were relevant in aiding the jury to reconstruct the crime scene as described by the witnesses...."); *Young v. State,* 1985 OK CR 59, ¶ 5, 701 P.2d 415, 417 (photograph of victim's body "aided the jury in reconstructing the crime scene.").

curred. This basic jury function does *not* typically require the assistance of an expert; nor is expert testimony generally appropriate or admissible for this purpose.[142]

¶ 66 On the other hand, "crime scene reconstruction," using the term more narrowly, can involve various specific fields of expertise, such as fingerprint analysis, bloodstain pattern analysis, DNA analysis, *etc.*[143] And this Court recognizes that a person could develop expertise in the discipline of bringing together such fields of expertise—whether they be scientific, technical, or experience-based—to reach broader conclusions than the individual fields permit.[144] Furthermore, an ability to synthesize these different types of evidence, particularly evidence of a type unfamiliar to most jurors, could indeed assist the jury in its factfinding role. Hence expert "crime scene reconstruction" testimony may be admissible to "assist the trier of fact to understand the evidence or to determine a fact in issue."[145]

¶ 67 Nevertheless, as we emphasized in *Romano v. State*,[146] the nature and extent of this testimony must be carefully limited, so that the testimony does not usurp the jury's fact-finding role: "While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible."[147] It is the trial court's essential role to serve as the initial gatekeeper regarding the propriety of expert opinion.[148] Yet once it is established that expert testimony in a particular field is admissible *and* that a witness is an expert in that field, opposing counsel also plays a critical role in ensuring that the specific testimony given remains within appropriate parameters and that the limitations of the expert's testimony are brought before the jury.[149]

¶ 68 In the current case, Bevel's crime scene reconstruction testimony was used to help establish the various events involved in Mitchell's attack upon Scott and the most likely sequence of those events.[150]

142. For example, it would be inappropriate to have an expert witness testify about which witnesses were most likely telling the truth, based upon an "expert" evaluation of their credibility.

143. The Court notes that this list is far from exhaustive of the numerous types of expert testimony that could be appropriate in a criminal trial.

144. *See Harris*, 2000 OK CR 20, ¶ 10, 13 P.3d 489, 493 (referring to "advancements in the field of crime scene reconstruction"); *cf. Willingham v. State*, 1997 OK CR 62, ¶ 75, 947 P.2d 1074, 1088 (noting that testimony about how a murder was committed "should be left to those experts who have been trained in the sciences and arts of crime scene reconstruction and evidence interpretation"), *overruled on other grounds in Shrum v. State*, 1999 OK CR 41, ¶ 10 n. 8, 991 P.2d 1032, 1036 n. 8.

145. *See* 12 O.S.2001, § 2702.

146. 1995 OK CR 74, 909 P.2d 92.

147. *Id.* at ¶ 21, 909 P.2d at 109 (citations omitted). In *Romano*, we found that Bevel testified beyond the scope of permissible expert testimony when he effectively told the jury that, in his expert opinion, the defendant actively participated in the stabbing of the victim. We concluded that such testimony "overstepped the bounds of proper blood spatter expert opinion and consti-

tutes prejudicial personal opinion." *Id.* at ¶ 25, 909 P.2d at 110.

148. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that "the trial judge's general 'gatekeeping' obligation" regarding expert testimony "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 141, 119 S.Ct. at 1171 (*Daubert* applies to non-scientific expert testimony). The Court noted that the objective of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. at 1176.

149. *See Romano*, 1995 OK CR 74, ¶ 22, 909 P.2d at 110 (defense counsel exposed imprecision and limits of Bevel's expert testimony through cross-examination). In Mitchell's resentencing, defense counsel objected to some of the questions asked of Bevel, but conducted no cross-examination.

150. Bevel testified extensively about what the physical evidence at the crime scene—including the bloodstain patterns, the position of Scott's body, the location of various objects, *etc.*—suggested about the "weapons" Mitchell used to attack Scott (including his hands, a golf club, a compass, and a coat rack) and the order in which they were used. Bevel also testified about

The nature, extent, and ordering of these events was relevant to the jury's determination regarding the "heinous, atrocious, or cruel" aggravating circumstance.[151] Although one remark by the trial court suggests that the court may not have fully appreciated its role as gatekeeper,[152] Mitchell fails to establish that any significant testimony by Bevel was improper or unfairly prejudicial to him.[153] We conclude that the trial court did not abuse its discretion in allowing the crime scene reconstruction testimony of Bevel.[154] Mitchell was not prejudiced by the court's failure to hold a *Daubert* hearing in this case, and this proposition is rejected entirely.[155]

¶ 69 In Proposition IX, Mitchell raises the following six challenges regarding the victim impact evidence admitted in his case: (1) victim impact evidence was admitted prior to the State proving the existence of an aggravating circumstance; (2) other family members of the victim were allowed to testify after David Scott testified as the "family representative"; (3) the presentation of victim impact evidence throughout the State's resentencing case was improper, unfair, and undermined the reliability of the proceeding; (4) victim impact evidence serves as an unconstitutional "super-aggravator"; (5) the victim impact evidence given was improper, as it focused solely on the emotional impact of the victim's death; and (6) the uniform instruction regarding victim impact evidence is unconstitutional, because it refers to the "loss to society." We take up these arguments in turn.

¶ 70 First, we conclude that the State adequately established at least one aggravating circumstance prior to the presentation of victim impact testimony.[156] The first witness at Mitchell's resentencing was Maria Bustos, who testified about Mitchell raping her when she was 11 years old and he was 15 years old. The second witness was Michael Harjochee, who testified that he knew Mitchell from living in the neighborhood and Elaine Scott from her work at the Pilot Center, and that Mitchell made a sexual comment about Scott to him. Before David Scott was presented as the State's third witness— and first victim impact witness—the trial court ruled that the State had adequately established the continuing threat aggravator, in order to allow presentation of victim impact evidence.[157] Mitchell fails to establish either error or prejudice in this regard.[158]

¶ 71 Second, we take up Mitchell's claim about allowing victim impact testimony in addition to that of a family representative. Three victim impact witnesses testified at

the likelihood of some type of sexual attack upon Scott prior to her death. He noted hip bruises consistent with someone exerting pressure in this area, and also that the lack of significant blood on her clothing was inconsistent with a scenario in which the clothing was removed after her death.

151. The Court notes, however, that given the limited context of the resentencing and the preceding testimony of the medical examiner, the length and scope of Bevel's testimony seem overdone.

152. Responding to a defense objection regarding Bevel's ability to testify on a particular topic, the trial court stated, "I feel quite confident that Mr. Bevel, if he does not have an expertise as to any question, that he would so state that he doesn't, he's not able to answer that question."

153. We agree that Bevel's "expert" testimony that being stabbed repeatedly by a compass would "hurt" was improper opinion testimony, since this opinion is based simply on the experiences of everyday life. Nevertheless, Mitchell

was not prejudiced by such a commonsense observation.

154. *Kumho*, 526 U.S. at 152, 119 S.Ct. at 1176.

155. We do not separately address Mitchell's challenge to the rebuttal testimony of Dr. Herman Jones, because (as noted in Proposition VII) this testimony related only to the continuing threat aggravator, which the jury rejected.

156. *See Cargle v. State*, 1995 OK CR 77, ¶ 76, 909 P.2d 806, 828, ("[V]ictim impact evidence should not be admitted until the trial court determines evidence of one or more aggravating circumstances is already present in the record."), *habeas relief granted on other grounds in Cargle v. Mullin*, 317 F.3d 1196 (10th Cir.2003).

157. The court further noted that evidence from Mitchell's original convictions would be sufficient to establish the other two aggravators alleged by the State.

158. Although Mitchell's jury ultimately rejected the continuing threat aggravator, this does not

Mitchell's resentencing: David Scott (the victim's brother), Bruce Scott (the victim's father), and Ann Scott (the victim's mother). Before David Scott's testimony, a *Cargle* hearing was held regarding the State's victim impact evidence.[159] The State announced that David would serve as the family spokesperson, elicited testimony from Ann Scott confirming the family's desire to have him serve as their "family representative," and then swore David in as the family's designee. Defense counsel raised numerous objections to the proposed testimony, noting particularly, that if David was going to testify as the family representative, other family members should be precluded from testifying.[160]

¶ 72 David Scott's testimony recounted memories of events and adventures with his sister. He described some of her activities as a college student at the University of Oklahoma, including playing in the marching band, and how he had planned to share a home with her when he entered college there. He also testified about how his life had been affected by her death and the impact of her absence from the family. He concluded by describing the effect of his sister's death upon their parents.[161] When the State later offered the testimony of Bruce and Ann Scott, Mitchell re-raised his objection that these witnesses should not be allowed to testify, since David Scott had already testified as the family representative. The trial court overruled the objection.[162]

■ ¶ 73 In *Lott v. State*,[163] this Court recently addressed the language of 22 O.S. 2001, § 984.1, which governs who may present victim impact evidence at trial. We determined that such evidence can be presented only by: (1) the victim, (2) members of the victim's immediate family, or (3) someone designated by the victim or the victim's family as the representative of the victim or the family.[164] After examining the language of § 984.1, we concluded: "The listing in the disjunctive of the persons who may give victim impact evidence indicates the Legislature's intent to make these three categories of victim impact witnesses mutually exclusive."[165] Hence it is error to allow a witness to testify as a representative of the victim's family and then also allow members of the victim's family to testify on their own behalf. As we noted in *Lott*, "The purpose behind a family designee is to give a voice to family members unable to testify in court."[166]

¶ 74 Thus the trial court erred in allowing David Scott to testify as the representative for the Scott family, and then also allowing Bruce and Ann Scott to testify separately. While each of these three persons was otherwise eligible to testify, about the impact of Elaine Scott's death on their individual lives, it was error to allow the testimony of other family members after David Scott testified as the family's designee. The impact of this error will be addressed within Proposition XVI.

undermine the validity of the court's sufficiency of the evidence finding regarding this aggravator.

159. *See Cargle*, 1995 OK CR 77, ¶ 76, 909 P.2d at 828.

160. The trial court ruled that the issue was not yet ripe, but could be raised if other family members later chose to testify.

161. He testified:
My family has been in disarray ever since my sister's death. My mother and father, still even 11 years later, still talk about it as though it happened yesterday. I remember asking my father what he wanted for Christmas the year after my sister was killed. His answer was, "What I want you can't give me. I want my daughter back."
That hurt me in ways I cannot describe. I asked him the same question three years ago and got the same response. The answer hurt just as bad. I have watched my parents slip in

and out of hopelessness and watched their health slip from them.

162. The trial court ruled:
I don't think there is anything in the statute that limits it to only one person. I mean, certainly there comes a point in time when it might be limited, but under the—in this case we have a brother, a father, and a mother are the only planned victim impact witnesses.
It should be noted that Mitchell has never challenged the propriety of these three persons testifying individually, since they are each members of the victim's immediate family.

163. 2004 OK CR 27, 98 P.3d 318.

164. *Id.* at ¶ 110, 98 P.3d at 347.

165. *Id.*

166. *Id.* at ¶ 111, 98 P.3d at 347.

¶ 75 Third, we decline to find that victim impact evidence must be presented in a particular order in relation to the other evidence in the State's sentencing case. The trial court properly determined that the State had presented adequate evidence of at least one aggravating circumstance before allowing the presentation of any victim impact evidence. Our law does not further restrict the State in its choices regarding how to order the presentation of sentencing evidence.[167] Our jury instructions clearly define the proper role of victim impact evidence in the sentencing process and distinguish this role from that of aggravating circumstances. Hence this portion of Mitchell's claim is rejected.

¶ 76 Fourth, we find no need to reconsider our established jurisprudence that victim impact evidence does not serve as an improper "super-aggravator."[168]

▬ ¶ 77 Fifth, Mitchell argues that the victim impact testimony given in his case was improper, as it focused almost entirely on the emotional aspects of the victim's loss, including describing her childhood. We have repeatedly noted the constitutional risk of focusing too much on such evidence.[169] Upon reviewing David Scott's testimony, we find that, standing alone, it did not violate due process or render Mitchell's sentencing unfair or unreliable. We have already concluded that Bruce and Ann Scott should not have been allowed to testify, since David Scott

testified as the family's designee. We note that Ann Scott's testimony was more emotional than that of Bruce Scott.[170] We will consider the impact of this improperly admitted testimony in Proposition XVI.

▬ ¶ 78 And finally, we find no error in the victim impact jury instruction used in Mitchell's case. This instruction was promulgated by this Court in *Cargle*.[171] Mitchell challenges the portion of the instruction describing victim impact evidence as "intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family." This language arises directly from the Supreme Court's decision in *Payne v. Tennessee*.[172] Mitchell argues that the reference to "loss to society" is improper under Oklahoma law, which limits its victim impact evidence to the effect of the victim's death on "immediate family members."[173]

¶ 79 As discussed earlier, Oklahoma law does strictly limit *who* can present victim impact evidence, *i.e.*, the victim *or* members of the victim's immediate family *or* a representative of the victim or the family.[174] Oklahoma law also constrains the content of such testimony, through our statutes and our caselaw interpreting these statutes and relevant U.S. Supreme Court decisions. Yet nothing within this governing authority pro-

---

167. *See Wood v. State*, 1998 OK CR 19, ¶ 47, 959 P.2d 1, 13 (finding that *Cargle* "was not intended to dictate the order of presentation of evidence during the second stage").

168. *See, e.g., Cargle*, 1995 OK CR 77, ¶ 75 n. 15, 909 P.2d at 828 n. 15; *see generally Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

169. *See Cargle*, 1995 OK CR 77, ¶ 81, 909 P.2d at 830 ("The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a 'reasoned moral response' to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process."); *Conover v. State*, 1997 OK CR 6, ¶ 67, 933 P.2d 904, 921 ("[I]n admitting evidence of emotional impact, especially to the exclusion of other factors, a trial court runs a much greater risk of having its decision questioned on appeal.") (citing *Cargle* ).

170. Ann Scott also described the impact of the victim's death on other family members.

171. *See Cargle*, 1995 OK CR 77, ¶ 77, 909 P.2d at 828–29 (promulgating instruction now found at OUJI–CR 2d (Supp.2000) 9–45).

172. In *Payne*, the Court emphasized that just as evidence about the specific harm caused by a defendant is, in general, a legitimate sentencing consideration, evidence about how a murder victim's death represents a "loss to the victim's family and to society" is likewise appropriate in a capital sentencing proceeding. *See* 501 U.S. at 825, 111 S.Ct. at 2608.

173. Mitchell argues that this reference to society's loss was particularly prejudicial in his case, since the jury heard substantial testimony about Elaine Scott's contributions to society.

174. *See* 22 O.S.2001, §§ 984 and 984.1 (discussed *supra* ).

hibits evidence about how the victim's death represents a loss to society, so long as this evidence is otherwise appropriate. We recognize, as did the *Payne* Court, that a capital sentencing should not be focused upon the comparative "worth" to society of the victim whose life was taken.[175] Nevertheless, we also recognize that providing even a brief "glimpse" of the life that the defendant extinguished will often involve evidence about what kind of person the victim was—including evidence suggesting the victim's unique role in and contributions to society.[176] Similarly, a family member's testimony about the impact of a victim's death on that individual may also tend to suggest the victim's special role in society generally.[177]

¶ 80 While such evidence must be carefully evaluated under our existing standards, victim impact evidence suggesting that a particular victim was a uniquely valuable member of his or her community and our society is not *per se* inadmissible in a capital sentencing proceeding. Furthermore, we conclude that the single reference to the "loss to society" within our uniform jury instruction is constitutional and is also appropriate under Oklahoma law. Hence this portion of Mitchell's victim impact claim is rejected.

¶ 81 In Proposition X, Mitchell argues that under *Ring v. Arizona*,[178] his jury should have been instructed that it could only impose the death penalty if it found that the aggravating circumstance(s) in his case outweighed the mitigating circumstances "beyond a reasonable doubt."[179] Mitchell argues that under 21 O.S.2001, § 701.11, the jury's finding that any aggravating circumstances in the case "outweigh" any mitigating circumstances—like the jury's finding that one or more aggravating circumstances exist—must be made "beyond a reasonable doubt."[180] Mitchell preserved this claim in the trial court. Nevertheless, we rejected this claim in *Torres v. State*,[181] and we decline to revisit the issue here.

¶ 82 In Proposition XI, Mitchell challenges the refusal of the trial judge, the Honorable Susan P. Caswell, to recuse from his case.[182] On January 24, 2002, defense counsel made an in camera oral request that Judge Caswell recuse. At a subsequent hearing, on February 4, 2002, Judge Caswell informed the parties that she had investigated her personal involvement in Mitchell's original trial and found that she had no contact with the handling of that case. On the other hand, Judge Caswell acknowledged that she was "friends with Judy Busch" and that they had attended parties in each other's homes. She also disclosed that she had attended the wedding of Judy Busch's daughter to the victim's brother.[183] Judge Caswell noted that she did not

---

175. *See Payne*, 501 U.S. at 823, 111 S.Ct. at 2607.

176. *See Cargle*, 1995 OK CR 77, ¶ 75, 909 P.2d at 828 (under 22 O.S. § 984, victim impact evidence can include a "quick glimpse" of the life the defendant chose to extinguish).

177. For example, a family member might testify that the loss of the victim was especially painful and seemed particularly unjust because the victim had devoted his or her life to serving others.

178. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

179. Mitchell's jury was instructed in accord with OUJI–CR 2d (Supp.2000) 4–80. This instruction requires unanimity regarding the jury's weighing determination, but it does not mention the "beyond a reasonable doubt" standard regarding this determination.

180. *See* 21 O.S.2001, § 701.11 ("Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found

that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.").

181. 2002 OK CR 35, ¶¶ 3–7, 58 P.3d 214, 215–16.

182. Mitchell's resentencing case was originally assigned to the Honorable Ray C. Elliott. The parties agreed, however, that Judge Elliott should recuse, based upon his active participation in the original prosecution of Mitchell, while Elliott was the Director of the Criminal Division in the Oklahoma County District Attorney's Office.

183. Although the transcript does not contain the name of the "victim's brother" whose wedding Caswell attended, Mitchell asserts that the referenced brother is David Scott, who testified as a victim impact witness during Mitchell's resentencing. The State does not contest this assertion.

believe that this fact, "in and of itself," was grounds for her recusal, but agreed to take up the matter after Mitchell filed a formal motion to recuse.

¶ 83 On February 19, 2002, defense counsel filed a motion seeking Judge Caswell's recusal from Mitchell's resentencing.[184] A hearing was held on the motion on March 6, 2002. During this hearing Judge Caswell again emphasized (after even further investigation) that she had no involvement "whatsoever" with Mitchell's original prosecution. She noted that the sex crimes division had not handled the case and that this Court had allowed her to preside over other criminal cases, despite her campaign literature.[185] She also downplayed the extent of her "acquaintanceship" with Judy Busch, noting that they did not go to lunch or call each other regularly.[186] Judge Caswell concluded that none of the reasons cited by Mitchell required her recusal, and that she would not recuse.

¶ 84 Although Mitchell now challenges Judge Caswell's failure to recuse, he did not challenge this failure at the proper time or in the proper manner. Rule 15 of the Rules for District Courts of Oklahoma

establishes the procedure for pursuing a disqualification motion.[187] Under Rule 15, a party whose motion to disqualify a judge is denied can request a "re-hearing" on this motion with the chief judge of the county in which the case is pending.[188] If the chief judge of the county likewise denies the moving party's request to disqualify the assigned judge, the moving party (in a criminal case) can pursue a mandamus action in this Court to have the assigned judge disqualified.[189]

¶ 85 Mitchell did not seek a rehearing with the chief judge of Oklahoma County; nor did he pursue the matter in this Court via a mandamus action. In fact, the record in this case reveals that, on March 15, 2002, at a status conference hearing, Mitchell's counsel informed Judge Caswell that they had decided to "abandon" their recusal motion. Although the briefs of both parties to this case fail to address (or even note) Mitchell's decision not to pursue his disqualification claim under Rule 15, this Court cannot ignore this choice.

¶ 86 The required method for challenging the refusal of a trial judge to disqualify is well established in this State, as is the effect of failing to follow this protocol.[190] In *Welch*

---

184. The recusal motion cited the following as reasons that Judge Caswell should recuse: her work as an assistant district attorney in the sex crimes division of the Oklahoma County D.A.'s Office at the time of Mitchell's original trial; her campaign literature expressing her commitment to fight for the rights of victims; a personality conflict with Mitchell's original attorney; and the judge's personal relationship with Judy Busch, "a prominent victim's rights advocate," and attendance at the wedding of Busch's daughter to the brother of the victim in this case.

185. Judge Caswell maintained that her work in the sex crimes division would not be relevant to Mitchell's resentencing, since his rape and sodomy convictions had been thrown out: "So those will not be even issues in this case for this jury to be concerned about...."

186. At the February 4, 2002, hearing, Judge Caswell stated simply: "I am friends with Judy Busch." She repeatedly described their relationship as a "friendship" and noted that she attended the wedding "as a friend of Judy Busch's." She contrasted this relationship with her connection to the victim's brother, which she described as an "acquaintanceship." At the March 6, 2002, hearing, however, Judge Caswell consis-

tently and insistently described her relationship with Judy Busch as an "acquaintanceship." She stated, "I told you all at the last hearing what my relationship is with Ms. Bush [sic]. We are acquaintances."

187. *See* Rule 15, *Rules for District Courts of Oklahoma*, Title 12, Ch. 2, App. 1 (2002).

188. This rehearing request must be filed in the case within five days of the judge's refusal to recuse. *See* Rule 15(b). And if a party is seeking the disqualification of the chief judge, the rehearing request should be filed with the presiding judge of the administrative district. *Id.*

189. *See* Rule 15(b) & (c). The party seeking to disqualify the assigned judge must file an original proceeding in mandamus with this Court, within five days of the adverse order. We will not entertain the mandamus action, "unless it is shown that the relief sought was previously denied by the judge to whom the matter was represented in accordance with this rule." *See* Rule 15(b).

190. In *Hatch v. State*, 1983 OK CR 47, 662 P.2d 1377, this Court noted that the proper statutory procedure for disqualifying a judge is established

*v. State,*[191] we noted that " 'the right to preclude a disqualified judge from trial is a personal privilege which can be waived' by the failure to strictly comply with the proper procedure for seeking the disqualification of the trial judge." [192] We conclude that Mitchell has waived the right to pursue his claim that Judge Caswell should have recused from his resentencing, by failing to properly pursue this claim.[193]

 ¶ 87 We note, however, that while a defendant can waive his right to preclude a disqualified judge from hearing his case, that defendant does *not* thereby waive the right to have his trial conducted in a fair and impartial manner. Whether or not a defendant can or does establish *before* trial that a particular judge is so likely to be biased against him or her that the judge should recuse or be disqualified, the defendant is always entitled to a trial that is, in fact, fairly conducted.[194] As we noted in *Fitzgerald v. State,*[195] "The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court." [196] Hence whether or not Judge Caswell should have

recused when she was asked to do so, she was obligated to conduct Mitchell's resentencing in a fair and impartial manner.[197]

¶ 88 Within his claim challenging Judge Caswell's refusal to disqualify, Mitchell lists various examples of "bias" in the trial court's handling of his resentencing. The cited examples all overlap with other substantive claims raised on appeal, which are addressed separately within the relevant propositions.[198] Mitchell does not, however, raise a separate claim of trial court bias, beyond the waived recusal issue. This Court notes that the record in this case contains significant and disturbing evidence of bias on the part of the trial court.[199] We address the significance of this evidence in our fashioning of relief in this case.

¶ 89 In Proposition XII, Mitchell challenges two references to his original death sentence, which occurred during the State's cross-examination of Dr. Manuel Saint Martin.[200] Mitchell alleges that the references were deliberate prosecutorial misconduct and that they rendered his death sentence unreliable.

in 20 O.S. § 1403: "Strict compliance with this section is required before a trial judge will be disqualified." *Id.* at ¶ 5, 662 P.2d at 1380; *see also* 20 O.S.2001, § 1403 (mandamus action available for challenging judge's failure to disqualify).

191. 2000 OK CR 8, 2 P.3d 356.

192. *Id.* at ¶ 37, 2 P.3d at 372 (citing *Hatch* and quoting *Willis v. State,* 1982 OK CR 134, ¶ 4, 650 P.2d 873, 874); *see also Young v. State,* 74 Okla. Crim. 64, 123 P.2d 294 (1942) (failure to follow statutory mandamus procedure for disqualifying judge waives issue for appellate review).

193. Hence we will not address the merits of Mitchell's recusal/disqualification claim.

194. *See* Okla. Const. Art. 2, § 6 ("The courts of justice of the State shall be open to every person, ... and right and justice shall be administered without sale, denial, delay, or prejudice"); Okla. Const. Art. 2, § 7 (right to due process); *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927) (due process requires that trial judge "hold the balance nice, clear, and true between the state and the accused"); *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (biased judge is "structural defect[ ] in the constitution of

the trial mechanism" and therefore not subject to harmless error analysis).

195. 1998 OK CR 68, 972 P.2d 1157.

196. *Id.* at ¶ 10, 972 P.2d at 1163 (citing Okla. Const. Art. 2, § 6 and *Bryan v. State,* 1997 OK CR 15, 935 P.2d 338, 354–55).

197. *See, e.g., State ex rel. Vahlberg v. Crismore,* 213 P.2d 293, 295, 90 Okla.Crim. 244, 247 (Okl. Cr.1949) ("Every person accused of crime is entitled to nothing less than the cold neutrality of an impartial judge...."); *Bartell v. State,* 1994 OK CR 59, ¶ 13 n. 3, 881 P.2d 92, 96 n. 3 (right to impartial judge so fundamental to due process that denial not subject to harmless error analysis) (citations omitted).

198. Mitchell lists the following Propositions as involving bias: I, II, III, VI, VII, VIII, XII, and XIII.

199. Some of this evidence is discussed within other propositions.

200. The trial court had sustained Mitchell's motions in limine forbidding any reference to his overturned death sentence and prohibiting any comments that would violate *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

¶ 90 During direct examination Dr. Saint Martin contrasted the extent to which Mitchell accepted responsibility for the murder of Scott during a 1997 interview (when Mitchell blamed everything on "C–Ray") with his acceptance of responsibility during an interview conducted in 2002 (in which Mitchell admitted that he alone killed Scott). On cross-examination, the prosecutor elicited testimony from Dr. Saint Martin indicating that in 1997, Mitchell's perspective was that he wanted to be either executed or released; yet by 2002, Mitchell had come to accept that he would be imprisoned for the rest of his life, but he did not want to be executed. This questioning was not challenged.

¶ 91 Within further questioning about the 1997 interview, however, the following occurred:

> PROSECUTOR: And he made a point of telling you, I'm not going to be able to give up C–Ray because of my fear on behalf of my family?
>
> DR. SAINT MARTIN: Yes.
>
> PROSECUTOR: So he wants to make himself look good, I'm willing to take the heat, stay on death row—

At this point, even before an objection was raised, the prosecutor stopped his questioning, asked to approach, and acknowledged that he had improperly referred to Mitchell's prior death sentence.[201] Defense counsel moved for a mistrial, arguing that an admonishment was inadequate to "unring that bill," and that the reference to Mitchell's previous death sentence would diminish the jury's sense of responsibility regarding its sentencing decision.

**201.** The prosecutor stated: "Your Honor, I don't have any—I was repeating a statement, but the words came out of my mouth wrong. I shouldn't have said it. Don't know what to do about it."

**202.** The prosecutor was attempting to contrast Dr. Saint Martin's trial testimony with a statement in his 1997 report, and asked, "Do you see any difference between what I just read and what you just told the jury?". Dr. Saint Martin responded, "Well, I understood that he was—he was telling me how he ended up on death row at the time that I went—."

**203.** In other words, a person unfamiliar with such things might believe that someone who has

¶ 92 The trial court agreed that the reference to "stay[ing] on death row" was improper and potentially necessitated a mistrial. Although the court described the reference as "certainly inadvertent," the court asked the parties to further research (overnight) whether a mistrial was necessary and admonished the jury to "disregard the last remark of counsel." Later—after the State completed its extensive cross-examination, defense counsel conducted redirect examination, and the State began recross-examination—Dr. Saint Martin himself referred to Mitchell's time on death row.[202] Once again, defense counsel's motion for a mistrial was denied (to be further addressed the next day), and the jury was admonished to "disregard the last remark of the witness."

¶ 93 An extensive mistrial hearing was conducted the next morning, before any further testimony. At the conclusion of this hearing, the trial court ruled that although the references to Mitchell's former death sentence were improper, it did not violate due process or the Eighth Amendment to allow Mitchell's resentencing trial to continue.

¶ 94 Upon reviewing the entirety of the prosecutor's questioning of Dr. Saint Martin, this Court finds no clear error in the trial court's determination that the references to Mitchell's prior death sentence were not the result of prosecutorial misconduct. The record supports the court's finding that these references were neither purposefully made nor deliberately elicited by the State. Furthermore, this Court notes that the references were indirect, and that many jurors might be unaware that a person can only be "on death row," if he or she has already been sentenced to death.[203] The jury instructions

been merely charged with a capital offense would be "on death row." The references during the prosecutor's closing remarks to "H unit"—in his argument about the behavioral incentives for a person "on H unit"—are an even more oblique reference to a prior death penalty verdict. Although this Court strongly cautions against such references—since one or more jurors could, in fact, realize that a prisoner is only placed on H unit after he or she has been sentenced to death—these remarks, to which no objection was raised, do not change the Court's conclusion that a mistrial (on this particular issue) was unnecessary in the current case.

clearly informed Mitchell's jurors that it was their responsibility to determine his sentence; and none of the challenged remarks did anything to lessen the jury's sense of responsibility in this regard. Nothing in the authorities cited by Mitchell required that the trial court grant a mistrial in this case.[204] This claim is rejected accordingly.

¶ 95 In Proposition XIII, Mitchell raises twelve separate allegations of prosecutorial misconduct during his resentencing. Some of his allegations are not supported by the record in this case.[205] Some of these claims are not adequately developed, and others were not properly preserved at trial.[206] In addition, some of the challenged prosecutorial actions or remarks have already been addressed.[207] Although our review of the record in this case reveals a substantial amount of what can fairly be described as "prosecutorial misconduct" of one sort or another, we conclude that only one of the specific claims raised by Mitchell on appeal merits separate discussion herein.[208]

¶ 96 Mitchell asserts that during his resentencing the prosecutor engaged in highly prejudicial and unprofessional conduct, including pointing and yelling directly at the defendant. Although such claims are difficult to fully evaluate on appeal—as we have only transcripts and not videotapes of what occurred—we are troubled by both the documented behavior of the prosecutor and the trial court's response to that behavior.

¶ 97 The challenged conduct apparently began during voir dire. During a bench conference on another objection, defense counsel noted that she objected to the prosecutor's behavior toward Mitchell, in particular, pointing at him and speaking angrily to him.[209] The trial court responded: "You show me some law, you show me some law that says you cannot point at a defendant." Defense counsel then argued: "It's prejudicial and it allows him by conduct to be asserting his personal opinion about how he feels about our client." Without addressing this argument or the propriety of the prosecutor's behavior, the trial court summarily overruled the objection and allowed the prosecutor to continue.

204. *See, e.g., Caldwell*, 472 U.S. at 328–39, 105 S.Ct. at 2639 ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."); *Romano v. Oklahoma*, 512 U.S. 1, 10, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (unconstitutional to "affirmatively mislead" jury regarding its role in capital sentencing process, "so as to diminish its sense of responsibility"); *Romano v. State*, 1993 OK CR 8, ¶¶ 97–103, 847 P.2d 368, 390–91 (information that defendant had been sentenced to death in another case irrelevant, but did not mislead jury regarding its role in capital sentencing process), *aff'd, Romano*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

205. The record does not support Mitchell's claim that the prosecutor "compared" Mitchell's case to other "notorious" crimes during voir dire. In addition, the record reveals that Mitchell did present evidence—through the testimony of witnesses who had met with him—suggesting that he felt remorse for his crimes. Hence the State's argument that Mitchell's evidence did not establish sincere remorsefulness was a legitimate critique of the defense evidence presented, rather than an indirect comment on Mitchell's failure to testify. *Cf. Smith v. State*, 1986 OK CR 158, ¶ 33, 727 P.2d 1366, 1373–74 (prosecutorial argument about defendant's lack of remorse permissible in capital sentencing "if there is support for the argument in the evidence presented").

206. Mitchell's bare assertion that the prosecutor "improperly denigrated the mitigating evidence" does not adequately develop this claim. In addition, Mitchell failed to object to the prosecutor's bolstering and vouching regarding Tom Bevel's testimony or to the prosecutor's comment that the victim's family had left the courtroom. We fail to find plain error in either regard.

207. The prosecutor's voir dire references to rape are addressed within Proposition I; and the presentation of cumulative evidence about the crime scene is addressed within Proposition VI.

208. Relief will be granted on a prosecutorial misconduct claim only where the misconduct effectively deprives the defendant of a fair trial or a fair and reliable sentencing proceeding. *See Spears v. State*, 1995 OK CR 36, ¶ 60, 900 P.2d 431, 445 (citing cases).

209. Defense counsel asserted:

And since we're up here, I object ... to him pointing at our client and then you overruled my objection and he took two steps further towards our client and pointed at him again, and he had anger in his voice, and we object to that kind of behavior. We don't think it's appropriate.

¶ 98 During his final closing argument, the prosecutor again directly confronted the defendant, as he encouraged the jurors to send Mitchell a message by their verdict.[210] At a bench conference, defense counsel asserted:

Your Honor, I object. I would like the record to reflect that Mr. Wintory has walked over to counsel table and is pointing at our client and he's talking directly to our client, and I believe that's inappropriate. It is akin to, by conduct, him expressing his personal opinion, he's showing his dislike for our client. It's prejudicial. It's more prejudicial than probative. It's violative of due process. It's not fair.

The trial court responded: "It's his closing argument. It's overruled." [211]

¶ 99 The prosecutor then continued with his argument about what the jury could say to Mitchell through its verdict, and apparently continued to yell and point directly at Mitchell as he did so.

PROSECUTOR: So what you all can do together is right to him, right to him, you're guilty of murder, you killed her in a way that was especially heinous, atrocious, and cruel. She consciously suffered. She suffered from when you attacked her near the chair, while she ran down the hallway, while she ran for the phone, while she slammed the door, she suffered when you grabbed her and ripped the phone from her hands, she suffered when you stripped her clothes from her, she suffered when you stripped her earring from her, she suffered when you forced her on the floor, she suffered when you sexually assaulted her, she suffered after you—

DEFENSE COUNSEL: Your Honor, I object.

THE COURT: Overruled.

PROSECUTOR: She suffered after you sexually assaulted her. You can tell him this with your verdict, that she suffered when you took the golf club to her, she suffered when you took your fist to her, she suffered when you rolled her over and you stuck the compass in her neck one, two, three, four, five, six times, she suffered when you broke the golf club over her head, she suffered while she laid there pleading and screaming and crying.

DEFENSE COUNSEL: Your Honor, may I approach?

THE COURT: No. Your objection is overruled.

DEFENSE COUNSEL: I need to make a record.

THE COURT: This is closing argument.

DEFENSE COUNSEL: I need to make a record.

THE COURT: Approach.

(The following was said at the bench:)

THE COURT: Counsel, what you're doing is interrupting the flow. I have ruled on this objection three times.

DEFENSE COUNSEL: I would like the record to reflect he is yelling and pointing at our client.

THE COURT: This is closing argument. I know of no cases that you cannot point at a defendant, nor do I know of no cases that you cannot raise your voice. This is closing argument. Your objection is overruled.

DEFENSE COUNSEL: Move for a mistrial.

THE COURT: Overruled.

The trial court then told the prosecutor that he could proceed, and he did.[212] The prose-

---

**210.** The prosecutor was arguing: "Ladies and gentlemen of the jury, you can with one voice say to him, you killed her in a way that is especially heinous, atrocious, and cruel. She consciously suffered. Ladies and gentlemen, together you can say, Alfred Brian Mitchell, you may not want to accept responsibility—". At this point defense counsel objected and asked to approach.

**211.** Defense counsel then moved for a mistrial, which was also denied.

**212.** The prosecutor continued as follows:

She suffered when you sexually assaulted her, she suffered after you sexually assaulted her, and you took the golf club to her. Ladies and gentlemen, your verdict can look right at him and say, she suffered when you broke the golf club over her head and you still weren't done. She suffered moaning, screaming, begging, crying, "Why, why, why?" When you went for the coat rack, she suffered the first time you hit her with the coat rack, she suffered the second time you hit her with the coat rack, she suffered the third, fourth, five, six, God knows how many times, until she was

cutor concluded by telling the jury that together their verdict could tell the defendant: "Alfred Brian Mitchell, you're sentenced to death. You're not entitled to mercy."[213]

¶ 100 Even the plain paper pages by which this Court obtains its limited view of this scene cannot fully silence or obscure the emotional crescendo with which this proceeding concluded. Neither the prosecutor nor the trial court questioned defense counsel's assertions that the prosecutor was standing immediately in front of the defendant, yelling and pointing at him, as he addressed him directly. And this Court has little doubt that these theatrics continued, perhaps increasing in intensity, each time the trial court refused to limit or prevent them. Despite the bench conferences, the jury could not have missed the fact that defense counsel was objecting to the confrontational and disrespectful way the prosecutor was addressing the defendant, or the fact that the trial court was adamantly allowing, if not condoning, this behavior.

■ ¶ 101 We conclude that the manner in which the prosecutor presented his closing argument—yelling and pointing at the defendant as he addressed him directly—was highly improper and potentially prejudicial.[214] There can be little doubt that the content and presentation of this closing argument was carefully calculated to inflame the passions and prejudices of Mitchell's jury.[215] The prosecutor's conduct allowed him—perhaps more forcefully than words alone could do— to express the utter contempt and disdain that he personally felt toward the defendant and his crime. This Court concludes that prosecutors should not be allowed to do through their actions and demeanor what we have expressly forbidden them to do with their words, namely, assert their personal opinion about the defendant or the crime.[216] While we continue to recognize the "liberal freedom of speech" that is appropriate to closing argument,[217] we also recognize that this freedom, like most, remains constrained by the rights of others, including the right to due process and to a reliable capital sentencing.

■ ¶ 102 Perhaps even more disturbing than the behavior of the prosecutor is the trial court's repeated refusal to in any way constrain or condemn this behavior. The trial court's stance was, essentially, that the court would allow the State to do as it willed unless defense counsel could produce a case, on the spot, specifically forbidding the challenged action.[218] This is not the proper role for a trial court judge. Trial judges are responsible for protecting and upholding the honor, dignity, and integrity of the proceedings held before them.[219] They are not pow-

---

quiet and you were done. Ladies and gentlemen, your verdict can say after she started crying and screaming the last time—and not Kareem; him—picked it up the last time and crushed her skull and she stopped suffering. Mitchell also challenges the manner in which the prosecutor aligned himself with the victim and spoke for the victim in this portion of his closing argument. *See Spees v. State,* 1987 OK CR 62, ¶ 18, 735 P.2d 571, 575–76 (improper for prosecutor to align himself with victim); *Tobler v. State,* 1984 OK CR 90, ¶ 16, 688 P.2d 350, 354 (improper to invoke sympathy for victim).

213. The prosecutor ended by reassuring jurors that a death penalty verdict is "not a vengeance, it's not hatred; it is justice."

214. Such behavior is likewise improper during voir dire and at any point during a trial.

215. *See McCarty v. State,* 1988 OK CR 271, ¶ 15, 765 P.2d 1215, 1221 (condemning prosecutorial argument that was "calculated to inflame the passions and prejudices of the jury"); *see also Jones v. State,* 1983 OK CR 31, ¶ 7, 660 P.2d 634, 646 (modifying death sentence "in light of the obvious prejudice effected by the statements made by the District Attorney during closing arguments").

216. *See, e.g., McCarty,* 1988 OK CR 271, ¶ 14, 765 P.2d at 1221 ("While a prosecutor may draw logical inferences and state his conclusions based on the evidence, it is improper for him to state his personal opinion.") (citation omitted); *see also Torres v. State,* 1998 OK CR 40, ¶ 48, 962 P.2d 3, 18 (citing *McCarty* ); *Ochoa v. State,* 1998 OK CR 41, ¶ 55, 963 P.2d 583, 601 (citing *McCarty* ).

217. *See Anderson v. State,* 1999 OK CR 44, ¶ 40, 992 P.2d 409, 421; *Thornburg v. State,* 1999 OK CR 32, ¶ 24, 985 P.2d 1234, 1244; *Marshall v. State,* 1998 OK CR 30, ¶ 20, 963 P.2d 1, 8.

218. The resentencing trial court repeatedly took this approach to defense counsel's objections.

219. *Cf. McCarty,* 1988 OK CR 271, ¶ 16, 765 P.2d at 1221 ("[T]he trial judge has an affirmative obligation 'to ensure that final argument to the

erless to control the bad behavior of the parties and attorneys who come before them; nor must they await a specific ruling from an appellate court in order to find a particular behavior improper.[220] The total failure to constrain this prosecutor, combined with the obvious annoyance displayed by the court that defense counsel was "interrupting the flow" of the State's argument, suggests that the trial judge may have forgotten, at least momentarily, where she was sitting and what she was wearing.

¶ 103 This Court finds that the prosecutor in this case committed serious and potentially prejudicial misconduct. Although the specific impact of such conduct is difficult to gauge, we evaluate the significance of this misconduct within our discussion of Mitchell's cumulative error claim in Proposition XVI. We further find that the trial court's repeated refusal to condemn or ameliorate this misconduct suggests a disturbing lack of evenhandedness that, though not properly raised as an independent claim of judicial bias, can be considered as we determine the appropriate remedy for the numerous other errors in this case.

¶ 104 In Proposition XIV, Mitchell argues that the "heinous, atrocious, or cruel" aggravating circumstance is "unconstitutionally vague and applied in an overbroad manner." We have repeatedly rejected the claim that this aggravator, as narrowed by this Court, is unconstitutionally vague.[221] In addition, we have recently addressed the argument that this aggravator is "overbroad as applied" and explained that an aggravating circumstance does not become "overbroad" based upon the manner it is applied to particular cases.[222]

¶ 105 Mitchell further argues that certain evidence was improperly admitted during his trial, namely, certain aspects of Tom Bevel's testimony (as discussed in Proposition VII) and at least some of the photographs and the crime scene video (discussed in Proposition VI). Mitchell asserts that absent the improperly admitted evidence, there is insufficient evidence to support the "heinous, atrocious, or cruel" aggravator. We have already addressed the propriety of the challenged evidence. We conclude that even without any of the improperly admitted evidence, there can be no doubt that the properly admitted evidence was more than sufficient to support the "heinous, atrocious, or cruel" aggravator in this case. We further find that even if Mitchell's jury had not been presented with *any* of the improperly admitted or cumulative evidence, there is not a reasonable probability that his jury would have failed to find that this aggravator applied. The evidence supporting the "heinous, atrocious, or cruel" aggravator in this case is simply compelling.[223]

¶ 106 In Proposition XV, Mitchell asks this Court to reconsider its prior rulings on eight different issues, noting that he is raising these claims in order to preserve them for the purpose of further review in any subsequent proceedings. We note, however, that some of the claims raised are not actually relevant to Mitchell's case.[224] Regarding the

jury is kept within proper, accepted bounds.' ") (quoting ABA Standards for Criminal Justice, The Prosecution Function, § 3–5.8(e) (1980)).

**220.** Although this Court has not, for example, specifically ruled that prosecutors cannot spit on defendants, surely most trial courts could reasonably infer that such behavior is impermissible.

**221.** In *Le v. State*, 1997 OK CR 55, ¶¶ 41–45, 947 P.2d 535, 552–53, for example, this Court upheld the constitutionality of the "heinous, atrocious, or cruel" aggravator, where the jury instruction used was identical to the one used in Mitchell's resentencing. *See also Black v. State*, 2001 OK CR 5, ¶ 78, 21 P.3d 1047, 1073–74.

**222.** *See DeRosa v. State*, 2004 OK CR 19, ¶¶ 90–91, 89 P.3d 1124, 1154–55, *cert. denied*, 543 U.S.

1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005). The *DeRosa* case also specifically discussed and rejected the assertion that the aggravator should be restricted to cases involving the infliction of "gratuitous violence." *Id.* at ¶¶ 92–93, 89 P.3d at 1155.

**223.** The properly admitted evidence overwhelmingly established "serious physical abuse" by Mitchell, resulting in "conscious physical suffering" by Scott. *See id.* at ¶ 96, 89 P.3d at 1156.

**224.** Regarding Mitchell's first claim, we note that his jury instructions did not contain the challenged "may be considered" language within the definition of "mitigating circumstances." Regarding Mitchell's second claim, we note that Instruction No. 19 specifically informed his jurors: "Even if you find that the aggravating

remaining clams, we acknowledge that Mitchell has raised the claims listed in his brief, but decline to revisit them here.

¶ 107 Finally, in Proposition XVI, Mitchell asserts that even if none of his individual claims merits relief, the cumulative effect of the errors committed during his resentencing necessitates that his death sentence be either reversed or modified. This Court has repeatedly recognized that when there are multiple errors or irregularities during a trial, reversal will be required if the "cumulative effect" was to deny the defendant a fair trial.[225] This same analysis applies to Mitchell's resentencing.

¶ 108 This Court has found serious error in numerous aspects of Mitchell's resentencing. We have found that the trial court abused its discretion in allowing the State to argue that Mitchell killed Scott in order to avoid arrest or prosecution for "raping" her—and that "rape" cannot serve as the predicate crime for the avoid arrest aggravating circumstance in this case. In addition, we have found that the State's notice of its intent to rely upon armed robbery and larceny as predicate crimes was entirely inadequate, and that the trial court abused its discretion in allowing the State to do so over defense objection. Hence we have concluded that the avoid arrest aggravating circumstance must be struck down in the current case.[226]

¶ 109 Even beyond this aggravating circumstance, this Court has concluded that the trial court abused its discretion in denying defense counsel any opportunity to question prospective jurors who expressed reservations about the death penalty—particularly in light of the inconsistent approach taken by the court regarding jurors who expressed reservations about the "life" sentencing options. We have found that the court abused its discretion by failing to constrain the extent of graphic photograph and videotape evidence presented to the jury. We have found that the trial court violated Mitchell's constitutional right to present mitigating character evidence, when it excluded letters and other written materials sent by Mitchell to his younger brother. And we have concluded that the court erred in allowing the victim's brother to testify as the "representative" of the victim's family, and then also allowing both of the victim's parents to testify as additional victim impact witnesses. In addition, this Court has found that the resentencing prosecutor committed serious prosecutorial misconduct, particularly during his final closing argument, and that the trial court erred in failing to prevent or ameliorate this misconduct.[227]

¶ 110 In light of all these errors and irregularities, this Court concludes that it must reverse Mitchell's death sentence. Furthermore, in light of the pervasive extent of these errors and irregularities, as well as the evidence suggesting significant trial court bias in the handling of Mitchell's resentencing, we decline to reweigh the remaining valid aggravator in this case with the mitigating evidence that is in the record. Although a capital jury certainly could choose to sentence Mitchell to death even after a properly conducted resentencing, and even after receiving the mitigating character evidence that was improperly excluded in this one, we cannot say with adequate certainty that it would. And we find that an actual jury, not this Court, should make this call.[228]

circumstance or circumstances outweigh the mitigating circumstance or circumstances, you may impose a sentence for life with the possibility of parole or imprisonment for life without the possibility of parole." We also note that the State failed to recognize this disparity between the claims "preserved" by Mitchell and the actual jury instructions in his case.

**225.** *See DeRosa*, 2004 OK CR 19, ¶ 100, 89 P.3d at 1157; *Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176; *Matthews v. State*, 2002 OK CR 16, ¶ 57, 45 P.3d 907, 924.

**226.** We have also concluded, however that the State shall not be precluded from pursuing this aggravating circumstance in any future resentencing, so long as it abides by the guidelines articulated by this Court in doing so.

**227.** The errors committed at Mitchell's resentencing were not all equally significant. For example, the admission into evidence of the timeline exhibit was not particularly prejudicial.

**228.** For the same reason we also decline Mitchell's invitation to simply modify his sentence.

¶ 111 Despite the horror of Mitchell's crimes, and the fact that this case has already gone on for fifteen years, we simply cannot allow Mitchell's current death sentence to stand. Because there is a reasonable probability of a different result in a properly conducted capital sentencing, we find that Mitchell is entitled to receive such a resentencing.[229] Furthermore, because of the substantial evidence of trial court bias contained in the record, we order that a new judge shall be assigned to this case, to preside over any future proceedings.

¶ 112 In Proposition XVII, Mitchell argues that his death sentence should be vacated, as part of this Court's mandatory sentence review. The overturning of Mitchell's death sentence by this Court renders this proposition moot.

## DECISION

¶ 113 For the reasons discussed in this opinion, the death sentence of Alfred Brian Mitchell is **REVERSED,** and this case is **REMANDED** to the District Court, where it shall be **REASSIGNED** to a new judge for **RESENTENCING.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18 App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON and LEWIS, JJ.: concur.

LUMPKIN, V.P.J., S. TAYLOR, S.J. (sitting by designation in lieu of A. JOHNSON, J.): concur in results.

A. JOHNSON, J.: recuse.

LUMPKIN, Vice–Presiding Judge: Concur in Results.

¶ 1 I concur in the decision to remand this case for resentencing. However, I cannot join in the attempt to limit the application of the "avoid arrest or prosecution" aggravating circumstance and to turn the capital sentencing stage of this case into a mini-trial on the existence of this aggravator. The opinion has wrongly focused on whether the defendant's actions immediately prior to and leading up to the murder constitute a statutorily defined crime for which evidence sufficient to support a criminal conviction must be presented. Such a scenario is covered under another aggravator, that of "prior violent felony." *See* 21 O.S.2001, § 701.12(1) (which requires evidence of a prior conviction for a violent felony to make a defendant death eligible). However, in the "avoid arrest or prosecution" aggravating circumstance, the focus is shifted from the legal outcome of the defendant's acts to the defendant's motivation and reason for committing the murder at that time. Under 21 O.S.2001, § 701.12(5) the State may allege as an aggravating circumstance that "[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." By this language, a person who kills to keep the victim from testifying about acts perceived to be criminal and prosecutable, committed prior to and leading up to the murder is death eligible. It is the motivation and perception of the defendant at the time of the homicide that satisfies the aggravator—not the underlying act itself.[1]

---

229. Although this Court does not decide the issue in the current case, I would hold that the jury's rejection of the "continuing threat" aggravator in the prior proceeding precludes the pursuit of this aggravator in any subsequent proceeding. It is my belief that the *Apprendi/Ring* revolution compels us to re-examine our sentencing precedents, with more focus upon respecting the primacy of jury verdicts. *See* cases cited *supra* in note 67. In particular, I maintain that a careful reading of the various opinions in *Sattazahn v. Pennsylvania,* 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003), particularly Part III of Justice Scalia's plurality opinion and Justice Ginsburg's dissent, reveals that a strong majority of the Court has rejected the doctrinal basis of *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), which would allow the State to try again on the continuing threat aggravator. I would hold that Mitchell has been "acquitted" of the continuing threat aggravator, *i.e.,* that he has been acquitted of the "greater offense" of "murder plus continuing threat," and thus that Double Jeopardy forbids allowing the State to repursue this aggravator in any subsequent resentencing. For a more comprehensive analysis of this issue, see my dissent in *Hogan v. State,* 2006 OK CR 19, —— P.3d ——.

1. [1] While I do not require the defendant to necessarily know or understand that his predicate act is a criminal offense, certainly the language of the statute providing for "lawful arrest or prosecution" requires the predicate crime to be an illegal act for which the defendant could be arrested and/or prosecuted.

¶ 2 This is clearly seen in *Cleary v. State*, 1997 OK CR 35, 942 P.2d 736. In finding the evidence sufficient to support the "avoid arrest and prosecution" aggravator, this Court stated in part:

In his video-taped statement Cleary attributed two critical statements to Chandler. These statements are, "If someone sees us we have to pop 'em'", and, immediately before the shooting, "She seen us, she seen us." **These statements show Cleary was aware of the need to eliminate any witnesses.** Applying the facts to the standard of proof, we find Cleary murdered the only witness to a burglary he had just committed.

1997 OK CR 35, ¶ 71, 942 P.2d at 751 (emphasis added)

¶ 3 Also, in *Lott v. State*, 2004 OK CR 27, 98 P.3d 318, we stated:

In the present case, the evidence showed Appellant subdued and raped both victims. While Appellant and the victims did not know one another, there is no indication Appellant attempted to hide his identity during the rape. **That the victims could have identified their assailant if left alive is sufficient to support the conclusion that the victims were killed in order to prevent their identification of Appellant and his subsequent arrest and prosecution.**

2004 OK CR 27, ¶ 117, 98 P.3d at 348 (emphasis added, internal citations omitted).

¶ 4 In the present case, Appellant had been released from the Rader juvenile detention center less than 3 weeks when he met Scott at the Pilot Recreation Center. He had been held at the juvenile detention center for the rape of an 11 year old. Appellant committed a sexual assault against Scott.

Appellant knew that if she reported the sexual assault to the police and identified him as the perpetrator, he was going back to jail. In Appellant's mind, the only way to prevent this was to kill Scott. The "avoid arrest" aggravator must be viewed through the eyes of the defendant at the time of the murder to determine the defendant's reason for the killing. To do more, is to not only disregard the language of the aggravator, but to obviate it.

¶ 5 While this Court has required the commission of a "predicate crime" in order to prove the aggravator, we have not required a criminal conviction for the predicate crime or proof of evidence beyond a reasonable doubt to support a conviction. Rather, the term "predicate crime" reflects that in most cases, the defendant has committed acts which could be prosecuted separate and apart from the murder.

¶ 6 The present case has an admittedly unusual set of circumstances involving the "predicate crime" used to support the "avoid arrest" aggravator. The opinion states that *Cummings* compels us to conclude trial court error in allowing the State to argue Appellant killed the victim in order to prevent his arrest or prosecution for having raped her. I agree that the forensic evidence now shows that a completed rape was not committed. Therefore, the State should not have been allowed to argue the aggravator was based upon the crime of rape. However, that does not mean that Appellant's assault upon the victim prior to her murder is insufficient to support the aggravator.

¶ 7 *Cummings* is factually distinguishable from the present case.[2] In *Cummings*, there was no evidence of the commission of any crimes other than those dismissed by the court. But, in reality, for this aggravator all

2. *Cummings* also causes me to reconsider how we analyzed the "avoid arrest" aggravator in that case. That opinion illustrates how easy it is for this Court to lose its focus where this aggravator is concerned. On appeal, this Court agreed with the defendant that evidence that he had abused and raped Moody could not be relied upon by the State to support the "avoid arrest" aggravator as the evidence supporting those criminal charges was found insufficient and the criminal charges were dismissed. Based upon the dismissal of those charges, this Court found the supporting evidence could not be used in support of the "avoid arrest" aggravator. I concurred in that finding based upon the dismissal

of the charges. However, instead of focusing on that legal determination, the focus should have been on the appellant's perceptions, motivations, and acts leading up to and preceding the murder. As I stated in my separate writing, "a 'verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.' *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554. 519 U.S. 148, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997)." 968 P.2d at 839. Upon review of *Cummings*, I would now find the acts underlying the child abuse/rape

that was required was for the defendant to perceive he could have been arrested or prosecuted for the underlying acts he committed, and which led to the homicide. In the present case, the evidence clearly shows that Appellant's acts before the murder comprised a criminal offense against the victim.

¶ 8 While forensics have caused us to rule out a completed rape, the evidence still indicates some type of sexual assault did occur. The majority opinion in this case makes much of the fact that "sexual assault" is not a specific statutorily enumerated offense. I agree that it is not a statutory offense, but rather a term which refers to and is generally understood to designate a class or category of sex-related crimes. However, I would extend the meaning of the term to a category of sex-related crimes not amounting to first degree rape.

¶ 9 In the present case, the evidence shows the commission of one of the following sex-related crimes: attempted rape pursuant to 21 O.S.2001, §§ 42, 44, & 1114; sexual battery pursuant to 21 O.S.2001, § 1123(B); or assault with intent to commit a rape pursuant to 21 O.S.2001, §§ 681 & 1114. Assuming arguendo, the "predicate crime" is to be a statutorily enumerated offense, any of those offenses listed above would be sufficient to satisfy the "avoid arrest" aggravator in this case.[3] However, I believe that under the statutory language of this aggravator, a defendant needs only to have committed acts at the time which caused him/her to believe could have led to his/her arrest or prosecution. A defendant is not required to be vested with the knowledge of a lawyer and be able to outline the elements of a crime before the aggravator is applicable, only that he/she has committed an act that he/she thinks is criminal in nature and may cause him/her to be arrested or prosecuted. That is sufficient evidence to satisfy this aggravator.

¶ 10 Further, as the focus of the "avoid arrest" aggravator is not the legal outcome of the defendant's predicate criminal act— that Appellant's acts leading to Scott's murder were originally labeled first degree rape, a conclusion subsequently proven by forensic evidence to be incorrect,—does not prevent the use of evidence of those acts from being used to support the "avoid arrest" aggravator. "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice between the alternative verdicts of death and life imprisonment.'" *Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 1755, 90 L.Ed.2d 123 (1986). To require the jury to make specific findings on the "predicate crime" and its elements would be contrary to the capital jurisprudence established by the United States Supreme Court and this Court. *See Brown v. State*, 2003 OK CR 7, 67 P.3d 917.

¶ 11 Upon resentencing, I find the State may ask the jury to find the existence of the "avoid arrest" aggravator by alleging and presenting evidence that Appellant killed the victim in order to prevent her from identifying and if necessary testifying against him for the commission of a sexual assault. In addition, I find the aggravator could also be supported by evidence of the armed robbery and potentially the larceny of an automobile, based on evidence that might be available.

¶ 12 Further, I do not find that because the jury did not find the existence of the "continuing threat" aggravator, the jury has effectively acquitted Appellant of that aggravator and it cannot be alleged in any future resentencing cases.

¶ 13 Initially, this conclusion is consistent with our holding in *Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120. Although the sentencing jury in that case did not find the existence of two of the aggravating circumstances alleged, the jury did find Appellant should receive the death penalty. On appeal, this Court found evidence in the record to

charge, regardless of the outcome of any legal proceedings against the defendant for the murder of Mayo, could be used to support the "avoid arrest" aggravator as they show Moody's murder was committed by the defendant in order to prevent Moody from identifying him in any investigation concerning Mayo's disappearance/death.

3. Alleging in the Bill of Particulars, the commission of a sexual assault upon the victim as evidence supporting the "avoid arrest" aggravator is sufficient to put Appellant on notice and enable him to defend against the aggravator.

support the statutory aggravating circumstances. Relying on *Poland v. Arizona*, 476 U.S. at 157, 106 S.Ct. at 1756, we remanded the case for resentencing so an appropriate sentencer could weigh the evidence of aggravating circumstances with any evidence of mitigating circumstances and render an appropriate sentence. "Put simply, when there is evidence of aggravating circumstances in the record and error requires reversal, the slate is wiped clean and a defendant may be subjected to any punishment authorized by law including death." 919 P.2d at 1127.

¶ 14 *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003), is further authority for this principle even though it is distinguishable from the facts in this case. In *Sattazahn* the jury deadlocked on punishment and state law provided that in such a circumstance, a life sentence was mandatory. The plurality holding of *Sattazahn* found the jury's inability to reach a decision in the penalty phase of a capital trial resulting in the imposition of a statutorily mandated life sentence did not bar the prosecution from seeking the death penalty again on retrial. 537 U.S. at 112–13, 123 S.Ct. at 740. The Supreme Court found that because the jury had deadlocked on sentencing, the appellant could not show he had been "acquitted."

¶ 15 While the jury in the present case did not find the existence of the particular aggravator, we do not have a unanimous finding that the aggravator did not exist at all. Some jurors may have found the aggravator while others did not. We simply do not know from the record. However, we do know the jury recommended Appellant be sentenced to death. Under these circumstances, Appellant has not shown that he has been "acquitted." This application of the law is consistent with our recent decision in *Hogan v. State*, 2006 OK CR 19, ¶¶ 52–59, 139 P.3d 907.

¶ 16 Regarding the allegations of prosecutorial misconduct, I agree that prosecutors should not express personal opinions regarding the evidence or the defendant's guilt, and that they should act in a respectful and professional manner. However, I am concerned that in its attempt to set boundaries for argument, the Court has done nothing more than seek to stymie the art of advocacy. The jury is clearly instructed on the distinction between evidence and argument, and the weight to be given each. The trial judge has a continuing duty and responsibility to supervise and control the conduct of counsel in the courtroom and to assure absolute professionalism at all times. This Court's repeated attempts to constrain argument are contrary to our well established rule allowing for liberal freedom of speech in closing argument. Under this type of trial micro-management great advocates such as William Jennings Bryant and Clarence Darrow would not have been able to utilize their oratory skills in an Oklahoma court.

¶ 17 In Proposition XV, I find Appellant has waived appellate review as he has not provided any argument or authority as to why this Court should reconsider it prior rulings on eight different issues. *See* Rule 3.5C, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2001). *See also Romano v. State*, 1995 OK CR 74, ¶ 65, 909 P.2d 92, 117.

¶ 18 I am authorized to state that Judge Steven Taylor joins in this separate vote and writing.